James **BUSHEY**, Roger D. Bell, Robert W. Ferber, William J. Norton, Robert J. Seitz, George Bartlett, Charles Page, Wayne Wilhelm, Wayne L. Strack, Robert Fucci, Gary H. Filion, Edward D. Rogan, Miles Barnes, Donald E. Clark and Gerald Sweeney, each individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

**NEW YORK STATE CIVIL SERVICE COMMISSION; Joseph Valenti, in his capacity as President of the New York State Civil Service Commission and Civil Service Commissioner; Josephine Gambino and James McFarland, in their capacity as Civil Service Commissioners; the New York State Department of Correctional Services; and Thomas A. Coughlin, III, in his capacity as Commissioner of the New York State Department of Correctional Services, Defendants-Appellants,**

and

Gerald A. Wells, Wilbur I. Wright, Joseph P. Bates, Thomas D. Haskell, and Percy Jones, Intervenors-Appellants.

No. 779, Docket 83–7893.

United States Court of Appeals, Second Circuit.

Argued Feb. 15, 1984.

Decided April 16, 1984.

Richard R. Rowley, Albany, N.Y. (Ronald G. Dunn and Mark T. Walsh, Jr., Rowley, Forrest & O'Donnell, P.C., Albany, N.Y., of counsel), for plaintiffs-appellees.

Ann Horowitz, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Barbara B. Butler, and Brenda S. Spears, Asst. Atty. Gen., New York City, of counsel), for defendants-appellants.

Paul A. Crotty, New York City (John D. Shyer and Richard W. Mark, Donovan, Leisure, Newton & Irvine, New York City, of counsel), for intervenors-appellants.

Before TIMBERS, MESKILL and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Defendants-Appellants ("Defendants" or "the State") and Intervenors-Appellants ("Intervenors") appeal from an order and judgment of the United States District Court for the Northern District of New York, Roger J. Miner, Judge, filed October 4, 1983, 571 F.Supp. 1562, denying Defendants' and Intervenors' motions for summary judgment and granting Plaintiffs-Appellees' ("Plaintiffs") motion for summary judgment. The district judge also enjoined Defendants from making appointments to the position of Correction Captain ("Captain") of the New York State Department of Correctional Services ("Correctional Services") from an eligibility list that was based on certain examination scores adjusted to eliminate what Defendants perceived to be the adverse racial impact against minority candidates of a written examination administered by the New York State Civil Service Commission ("Civil Service"). The district judge agreed with Plaintiffs, who are nonminority candidates for the position of Captain, that the State's adjustment of the minority candidates' raw test scores discriminated against nonminority candidates in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2 to 2000e–17 (1976 & Supp. V 1981) ("Title VII").

For the reasons set forth below, we reverse the order and judgment of the district court and we remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This action represents the most recent chapter in the controversial history of promotional examinations administered by the Civil Service for supervisory titles in the State's Correctional Services. The instant dispute began on January 30, 1982, when the Civil Service and the Correctional Services conducted Promotional Examination No. 37–526 for the position of Correction Captain. At the time the examination was given, no minority officers held permanent appointments as Captains in the State's prisons. After administering the test, the Civil Service tabulated each candidate's right and wrong answers to arrive at the candidates' raw scores. The tabulation results indicated that nonminority candidates had passed the test at about twice the rate as minority candidates,[1] as follows:

|  | Test Takers | Passing Candidates | Passing Rate |
|---|---|---|---|
| Nonminority | 243 | 119 | 49% |
| Minority | 32 | 8 | 25% |

In view of the "four-fifths" rule of the Equal Employment Opportunity Commission ("EEOC") Uniform Guidelines on Employee Selection, 29 C.F.R. § 1607.4(D) ("Guidelines"),[2] the State determined that the Captains' examination had an adverse racial impact on minority candidates because the passing rate of minority candidates was approximately fifty percent lower than the passing rate of nonminority candidates. Taking into account other factors that it felt reinforced its conclusion of adverse impact,[3] the State adjusted both

---

1. The Hispanic candidates were included in the minority grouping even though they had a 50% passing rate (two out of four).

2. 29 C.F.R. § 1607.4(D) provides, in pertinent part, that

   [a] selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

   In other words, under the Guidelines, a selection rate for minorities lower than 80% of the

selection rate for the highest scoring group may be regarded as evidence of adverse impact.

3. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment listed these factors as follows:

   [T]he basis for the decision to use differential scoring was the adverse impact of the written test, the litigation history of examinations for Corrections supervisory security titles, the lack of any empirical data indicating that minority and non-minority candidates for Captain would not perform equally well on the job, and the availability of data regarding the performance of minorities and non-minorities in the two supervisory titles directly below Correction Captain.

the minority and nonminority candidates' scores by converting them to separate frequency distributions and then equating or normalizing them with the respective means. The effect was to increase to fifty percent the percentage of minorities who passed the test. From the State's perspective, this adjustment served to correct the adverse racial impact of the test by equalizing the passing rate of minority and nonminority candidates. In practical terms, the adjustment added eight minority candidates to the eligibility list without removing any of the 119 nonminorities from the list.

By acting to eliminate the perceived adverse impact of the examination on minorities, the State sought anticipatorily to avoid litigation it assumed minority candidates would bring challenging reliance on the test to promote candidates to the position of Captain. Such litigation had resulted from the use of past promotional examinations with respect to Correction Sergeants in 1972, *Kirkland v. New York State Department of Correctional Services*, 374 F.Supp. 1361 (S.D.N.Y.1974), *aff'd in part and rev'd in part*, 520 F.2d 420 (2d Cir. 1975), *cert. denied*, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), *on remand*, 482 F.Supp. 1179 (S.D.N.Y.), *aff'd*, 628 F.2d 796 (2d Cir.1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981) (*"Kirkland Sergeants"*), and Correction Lieutenants in 1981, *Kirkland v. New York State Department of Correctional Services*, 552 F.Supp. 667 (S.D.N.Y.1982),

*aff'd*, 711 F.2d 1117 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984) (*"Kirkland Lieutenants"*).

The State did not succeed in staving off litigation; this time it was initiated by the nonminority candidates, who brought the instant action contending, *inter alia*,[4] that the State's adjustment of candidates' raw scores involved "reverse discrimination" in violation of Title VII. In its answer to the complaint, the State responded that it acted in good faith and in compliance with applicable law by voluntarily adjusting the raw scores to eliminate the examination's adverse impact. A group of minority candidates moved to intervene as defendants to assert that the written test had a facially discriminatory impact against them, that the use of separate frequency distributions to eliminate such adverse impact was proper, and that the remedial action taken by the State was the minimum necessary given the past pattern of discrimination that had been the subject of the *Kirkland Sergeants* and the *Kirkland Lieutenants* actions. The district judge granted the application to intervene by an order dated February 16, 1983.

In June, 1983, all parties moved for summary judgment. After hearing oral argument and reviewing the papers submitted by the parties in support of their respective positions,[5] Judge Miner denied Defendants'

---

The first two factors are discussed in the text. As to the third factor, the State explains the absence of data about minority performance in the position of Captain by noting that at the time of the examination, no minority persons held permanent positions as Correction Captains. The fourth factor involved empirical data that demonstrated that minorities and nonminorities performed equally well in the categories of Lieutenants and Sergeants. Appendix at 302–03; *Kirkland v. New York State Department of Correctional Services*, 482 F.Supp. 1179, 1182 (S.D.N.Y.), *aff'd*, 628 F.2d 796 (2d Cir.1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981).

**4.** Plaintiffs' complaint also asserted pursuant to 42 U.S.C. § 1983 a violation of their fourteenth amendment rights under the United States Constitution, as well as violations of 42 U.S.C.

§ 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. The district court rejected these claims and Plaintiffs do not renew them on appeal. Therefore, these claims are not before us. We also are foreclosed by the Supreme Court's recent decision in *Pennhurst State School and Hospital v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), from considering the claim in Plaintiffs' complaint that Defendants failed to comply with state law.

**5.** Defendants contend that at the close of oral argument on the summary judgment motions before the district judge, they requested but were denied leave to submit late an affidavit in response to the affidavit of Plaintiffs' expert, Dr. Kavanagh, submitted in support of Plaintiffs' motion for summary judgment. We assume that on remand Defendants will have an oppor-

and Intervenors' motions, granted Plaintiffs' motion for summary judgment, and enjoined Defendants from making appointments to the position of Captain based on the eligibility list.

The district judge based his conclusion on three principal grounds. He held that the factors considered by the State—the distribution of scores from the written test, the litigation history of prior Correctional Services examinations for supervisory titles, the absence of empirical data indicating that minority and nonminority candidates would not perform equally well as Captains, and the availability of some data regarding the job performance of minority candidates in the two supervisory titles directly below Captain—[6] did not establish a prima facie case of adverse racial impact vis-a-vis minority candidates. Moreover, he held that even assuming, *arguendo*, that the State had shown in defense of its actions a prima facie case of adverse racial impact, it still had acted in violation of Title VII because it had not proved that the inference of racial discrimination arising from a showing of adverse impact could not be rebutted by proof that the differences in test performance were job-related. In effect, the district judge held that before taking any voluntary action to eliminate the adverse racial impact of its selection process, the State, as an employer, had to meet the following two burdens: (1) make out a prima facie case of discrimination (in this context, adverse impact), and (2) prove that such prima facie case was not rebuttable. Finally, the district judge concluded that "[e]ven assuming the propriety of the need for defendants' actions in remedying the alleged discriminatory impact of [the] promotional procedures, the method by which defendants chose to effect their remedy was itself fundamentally flawed."

Upon review, we hold that the district court erred with respect to each of these grounds in granting summary judgment in favor of Plaintiffs. Consequently, we reverse and remand.

tunity to introduce evidence in support of their position.

## II. DISCUSSION

### A. *Prima Facie Case of Adverse Impact*

Plaintiffs argue that the district court held that the raw scores on the examination did not establish a prima facie case of adverse impact because, in Plaintiffs' words, the "statistical sample of Black and Hispanic candidates was simply too small to serve as a basis for a finding that the adverse impact was due to race or national origin." This contention, however, mischaracterizes the holding of the district judge, who expressly stated that he was "not prepared to hold that a pool consisting of thirty-two minorities and 240 or so nonminorities, is, as a matter of law, an inadequate number from which to draw statistical inferences." Instead, relying on a report submitted by Dr. Kavanagh, Plaintiffs' statistical expert, the district judge held that the admitted differences in score distributions resulted from differences in the prior experiences of several of the minority candidates. The record does suggest that of the candidates who took the examination, at least eleven of them qualified because of their experience as Correctional Supervising Officers with the Office of Drug Abuse Services ("ODAS"). Of those eleven, six were minority candidates. The district court, relying on the affidavit of Plaintiffs' expert, reasoned that the difference in test scores resulted not from an adverse racial impact of the test, but from this difference in employment experience between minority and nonminority candidates.

■ This reasoning does not comport with adverse impact analysis. The case law clearly provides that a prima facie case is established by a showing that an examination has an adverse racial impact on minority candidates. Thereafter, legitimate, job-related explanations for differences in score distributions become relevant to rebut the prima facie showing of adverse

**6.** As to the last two factors, see *supra* note 3.

racial impact. *See, e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431–36, 91 S.Ct. 849, 853–56, 28 L.Ed.2d 158 (1971); *Kirkland Lieutenants,* 711 F.2d at 1132; *Guardians Association of New York City Police Department, Inc. v. Civil Service Commission,* 630 F.2d 79, 86–87 (2d Cir. 1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission,* 490 F.2d 387, 391–92 (2d Cir.1973). Contrary to this approach, Judge Miner held that there had been no prima facie showing of adverse racial impact because the ODAS experience of some of the minority candidates explained the differences in score distributions. In other words, he turned to job-related explanations, which might be appropriate to rebut a prima facie showing of adverse impact, in order to determine that the prima facie case had not been made in the first place. This court previously rejected such an approach, urged by nonminority intervenors in the *Kirkland Lieutenants* case, by noting that "[a]lthough lack of experience may be relevant to the question of a test's job validity, it does not affect the question whether a *prima facie* case has been properly established." *Kirkland Lieutenants,* 711 F.2d at 1132. Even if prior experience were relevant to the prima facie showing of adverse impact, which it is not, we note, as the court in *Kirkland Lieutenants* stated, that the difference "in responsibility between Office of Drug Abuse [Services] officers and officers working at minimum and medium security [Correctional Services] facilities has been held to be negligible." *Id.* (citing *Stokes v. New York State Department of Correctional Services,* 569 F.Supp. 918 (S.D.N.Y. 1982)).

■ Having put aside the district court's erroneous interpretation of the prima facie case, we turn to Defendants' assertion that the test scores, and the application of the EEOC's "four-fifths" rule, established a prima facie showing of adverse impact. It is well-settled in the case law that "[a] prima facie violation of [Title VII] may be established by statistical evidence showing that an employment practice has the effect of denying the members of one race equal access to employment opportunities." *New York Transit Authority v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979); *see also Albemarle v. Moody,* 422 U.S. at 425, 95 S.Ct. at 2375 (prima facie case of adverse impact established by proof "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants"); *Kirkland Lieutenants,* 711 F.2d at 1130 (upholding district court's finding of a *"prima facie* case of employment discrimination through a statistical demonstration of disproportionate racial impact"); *Guardians v. Civil Service,* 630 F.2d at 88 ("statistics showing a significantly disparate racial impact have consistently been held to create a presumption of Title VII discrimination"); *Vulcan Society v. Civil Service,* 490 F.2d at 392–93 (upholding district court's finding of adverse impact by comparing test passing rates of minority and nonminority candidates). Similarly, "[w]hile courts are not bound by the EEOC Guidelines, the Supreme Court has declared that the guidelines should be shown 'great deference.' " *Teal v. Connecticut,* 645 F.2d 133, 137 n. 6 (2d Cir.1981) (quoting *Griggs,* 401 U.S. at 433–34, 91 S.Ct. at 854–55, and citing *Albemarle v. Moody,* 422 U.S. at 431, 95 S.Ct. at 2378), *aff'd,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *see also Guardians,* 630 F.2d 88 ("By any reasonable measure, including ... the four-fifths rule of the EEOC Guidelines, Exam No. 8155 had a disparate racial impact.").

■ Herein, the differences between the score distributions of minority and nonminority candidates were sufficient to establish a prima facie showing of adverse impact. Twenty-five percent of the minority candidates passed the test whereas nonminority candidates passed at a rate of forty-nine percent. Thus, the passing rate of minority candidates was approximately fifty percent lower than the passing rate of

the nonminority candidates. In other words, about five minority candidates passed the Correction Captain examination for every ten nonminority candidates who passed it.

In short, the test data established a prima facie case of adverse impact against minority candidates as a group. We cannot conclude, however, that the test data, by itself, establishes adverse impact as to Hispanic candidates, who were included within the minority grouping, since the record indicates that fifty percent—two of the four—of the Hispanic candidates who took the test passed it. It remains an open question, to be explored fully on remand, whether as to the Hispanic candidates there exists, on the basis of other factors cited by the State, "a sufficiently serious claim of discrimination to serve as a predicate" for the State's voluntary remedial actions.[7] *Kirkland Lieutenants*, 711 F.2d at 1130.

### B. *Burden to Rebut*

■ The district court also held, and Plaintiffs argue on appeal, that even if Defendants had made a prima facie showing of adverse racial impact, before adopting remedial measures they still had to demonstrate that such a case was not rebuttable by proof that the score distribution differences were not job-related. In other words, the district judge ruled that before taking steps to rectify a perceived violation of Title VII, the State, as an employer, had to meet two burdens—first establish a prima facie case of discrimination and then prove that such prima facie case was not rebuttable through job-related explanations. We hold that, in the context of this case, the imposition of the latter burden on a party seeking to comply voluntarily with Title VII is contrary to the case law and the statute's underlying policy.

■ As this court noted recently, "[i]t is settled that voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination." *Kirkland Lieutenants*, 711 F.2d at 1128; *see also Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998–99 n. 14, 67 L.Ed.2d 59 (1981) ("[in] enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims"); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) ("[c]ooperation and voluntary compliance were selected as the preferred means for achieving this goal"). By requiring proof of not only a prima facie case of adverse impact, but also of the inability to rebut such a case, the district court in effect posited a rule, contrary to the stated policy of voluntary compliance, permitting an employer, here the State, to take remedial actions only where there could be a judicial determination of racial discrimination.

This court expressly rejected such an approach when it was urged in the context of a voluntary settlement by nonminority employees who intervened to oppose the settlement agreed to by the parties in the *Kirkland Lieutenants* case. 711 F.2d at 1129–30. Herein, Plaintiffs' situation is analogous to the position of the intervenors in *Kirkland Lieutenants*, where minority employees challenged the State's use of an examination to promote candidates to the position of Correction Lieutenants. *Id.* at 1121. In *Kirkland Lieutenants*, the nonminority intervenors argued that "before any race-conscious relief can be granted to plaintiff class, there must be a judicial determination that Exam 36–808 and its resulting eligibility list are not job-related and are therefore racially discriminatory, *i.e.*, a mere statistical showing of disproportionate impact does not amount to a proper basis for settlement." *Id.* at 1129.

---

7. Our discussion *infra* is not meant to suggest that only a prima facie showing of adverse impact can serve as a sufficient predicate to voluntary remedial measures under Title VII. As discussed below, *Kirkland Lieutenants*, 711 F.2d at 1130, only requires "a sufficiently serious claim of discrimination." On remand, the State may show such a claim as to the Hispanic candidates on the basis of factors other than the subject examination scores.

This contention is essentially the same one raised by Plaintiffs herein and adopted by the district court; that is, this contention amounts to a claim that the State must prove the inability to rebut the prima facie case by showing that the differences in score distributions were not job-related. In *Kirkland Lieutenants,* this court rejected this argument on the ground that it "would turn Title VII law on its head since ... job-relatedness is never presumed ...." *Id.; see Guardians v. Civil Service,* 630 F.2d at 86–87; *Vulcan Society v. Civil Service,* 490 F.2d at 391–92. Moreover, "if intervenors' [in the instant case, Plaintiffs'] position were adopted, no Title VII testing case could be settled by agreement until a judicial determination on the test's job validity was made. Such a result would seriously undermine Title VII's preference for voluntary compliance ...." *Kirkland Lieutenants,* 711 F.2d at 1130 (citations omitted). Consequently, as Judge Lumbard wrote in *Kirkland Lieutenants* in the context of voluntary settlements, "a *prima facie* case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies." *Id.*

Plaintiffs attempt to distinguish *Kirkland Lieutenants* on the ground that the compliance plan therein was adopted on the basis of "arms' length" settlement negotiations. This distinction, however, is unpersuasive. It implies that the interests of nonminority employees were somehow more protected in *Kirkland Lieutenants,* where the State adopted the remedial plan under negotiation pressure from minority candidates, than they were in the instant case, where the State adopted the plan without such direct pressure.

Moreover, Plaintiffs' purported distinction would create an anomalous situation. It would require an employer, in this case the State, to issue a presumptively discriminatory eligibility list, wait to be sued by minority candidates, and only then seek a settlement pursuant to *Kirkland Lieutenants.* Such an approach would serve no purpose other than to impede the process of voluntary compliance with Title VII and cause the proliferation of litigation in all such cases, thereby generating litigation costs and favoring litigious over nonlitigious employees.

The "rebuttal burden" urged by Plaintiffs and adopted by the district court also is contrary to the Supreme Court's approach in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).[8] Without requiring a judicial determination of racial discrimination (in fact, the defendant therein denied that it had engaged in past discrimination), the majority in *Weber* upheld, as permissible under Title VII, an affirmative action plan "designed to eliminate conspicuous racial imbalance in traditionally segregated job categories." *Id.* at 209, 99 S.Ct. at 2730 (footnote omitted). In doing so, the Court rejected the contention raised by nonminority plaintiffs that a judicial determination of racial discrimination was a necessary predicate to the adoption of race-conscious remedial measures. The broadness of the majority's view is suggested by Justice Blackmun's concurrence, which in urging a narrower ground nevertheless noted that "[t]he Court ... declines to consider the narrow 'arguable violation' approach and adheres instead to an interpretation of Title VII that permits affirmative action by an employer whenever the job category in

---

**8.** We reject Plaintiffs' contention that *Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, is inapplicable because the employer in *Weber* was a private entity whereas here it is a public entity. *See, e.g., Kirkland Lieutenants,* 711 F.2d at 1130 (applying *Weber*); *Bratton v. City of Detroit,* 704 F.2d 878, 884 n. 18 (6th Cir.1983) (applying *Weber* in suit by nonminority police-

men against the City of Detroit), *cert. denied,* — U.S. —, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *Local Union No. 35 v. City of Hartford,* 625 F.2d 416, 425 (2d Cir.1980) (applying *Weber* in suit against the City of Hartford), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

question is 'traditionally segregated.'" *Id.* at 212, 99 S.Ct. at 2731.[9]

In short, we hold that consistent with *Kirkland Lieutenants*, 711 F.2d at 1130, and *Weber*, 443 U.S. at 209, 99 S.Ct. at 2730, a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination [10] to serve as a predicate for employer-initiated, voluntary race-conscious remedies.[11]

#### C. *Adjustment Methodology*

■ The district judge also held that "[e]ven assuming the propriety of the need for defendants' actions in remedying the alleged discriminatory impact of [the] promotional procedures, the method by which defendants chose to effect their remedy was itself fundamentally flawed." Despite the possible statistical weaknesses in the State's approach,[12] the relevant question under *Weber* is whether in practical terms the plan "unnecessarily trammel[ed] the interests" of the nonminority employees. 443 U.S. at 208, 99 S.Ct. at 2730. Herein, as in *Weber*, the adjustment plan did not displace any nonminority candidates from the eligibility list (it merely added eight minority candidates to the list), did not place an absolute bar to the advancement of nonminority candidates, and was only temporary in nature. Moreover, the plan in the instant case was tailored narrowly to eliminate the adverse impact of the test and did not aim at maintaining a racial balance *in futuro*. Yet, we agree with the Court of Appeals for the District of Columbia that "*Weber* [does not] support[ ] the proposition that no purported affirmative action plan is ever unlawful unless it requires discharge, permanently bars advancement, or maintains racial balance ...." *Parker v. Baltimore and Ohio Railroad Co.*, 652 F.2d 1012, 1014 (D.C.Cir.

9. During oral argument, a question was raised as to whether a nonminority person *ever* had held a permanent appointment to the position of Captain in a State prison. The record apparently does not offer evidence with respect to this issue. On remand, the parties may wish to explore this point in connection with our discussion *supra* note 7 and the standard set forth in *Weber*, 443 U.S. at 209, 99 S.Ct. at 2730.

10. This holding is not intended to suggest that a showing of adverse racial impact is the only "sufficient serious claim of discrimination" that can serve as a predicate for voluntary remedial measures under Title VII. *See supra* notes 7 and 9.

11. Contrary to Plaintiffs' contention, the Supreme Court's decision in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), does not require an opposite result. Therein, minority employees brought a Title VII action against an employer, alleging discrimination on the basis of race. The Supreme Court reversed, holding that the circuit court erred in making a judicial determination of discrimination by merging the prima facie showing of disparate treatment under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny with the rebuttal question. Herein, we do not merge the prima facie and rebuttal questions. We only hold that consistent with *Kirkland Lieutenants*, 711 F.2d at 1130, and *Weber*, 443 U.S. at 209, 99 S.Ct. at 2730, a judicial determination of racial discrimination is not a prerequisite to an employer adopting voluntary, race-conscious remedies to comply with Title VII.

12. In concluding that the normalization and standardization process employed by the State was methodologically flawed, the district judge relied principally on the affidavit of Dr. Kavanagh, Plaintiffs' expert, which states that

> a normal distribution of scores achieved by a sufficient number of test takers when placed on a graph plotting the number of candidates achieving each score will result in a so-called "bell curve" which is created because most of the candidates receive marks in the middle range of scores while there are relatively few candidates who receive the highest scores or the lowest scores. Such a bell curve is ... known as a normal distribution.... I have plotted the scores, and upon plotting the scores of the non-minority candidates, ... the result is a typical bell curve. By contrast, when the scores of the 34 minority candidates are plotted on a graph, the line resulting is relatively flat, it is not a bell curve and prohibits standardizing scores based on the normal curve. The fact that there are only 34 minority candidates, not the minimum 100 needed to *allow* normalization ... exacerbates an already incorrect methodology.

Appendix at 282 (emphasis in original). On appeal, Defendants contend that the district judge denied them the opportunity to respond to the statistical arguments set out in Dr. Kavanagh's affidavit. *See supra* note 5.

1981). We conclude that herein the record is insufficient to determine whether the State's adjustment plan trammeled the interests of the nonminority candidates. Therefore, we remand to the district court for a full exploration of this disputed issue. *See id.* (concluding that the record did not contain sufficient information on the effect of affirmative action plan on nonminority employees, and holding that therefore "a crucial fact remained disputed, and ... summary judgment was premature").

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment and order of the district court and we remand for further proceedings consistent herewith.