**AFRO–AMERICAN PATROLMEN'S LEAGUE, et al.,**
**Plaintiffs-Appellees,**

v.

**CITY OF ATLANTA, et al.,**
**Defendants-Appellants.**

**Floyd L. REEVES, et al.,**
**Plaintiffs-Appellees,**

v.

**CITY OF ATLANTA, et al.,**
**Defendants-Appellants.**

**AFRO–AMERICAN PATROLMEN'S LEAGUE, et al., Plaintiffs,**

v.

**CITY OF ATLANTA, et al.,**
**Defendants-Appellants,**

**Fraternal Order of Police, Atlanta Lodge 8, et al.,**
**Intervenor-Appellees.**

**Nos. 85–8826, 85–8827, 86–8253.**

United States Court of Appeals, Eleventh Circuit.

May 27, 1987.

George R. Ference, W. Roy Mays, III, Marva Jones Brooks, Atlanta, Ga., for defendants-appellants.

Charles A. Shanor, Atlanta, Ga., for plaintiffs-appellees.

Donald R. Livingston, Atlanta, Ga., for FOP.

Before FAY and JOHNSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

HENDERSON, Senior Circuit Judge:

The City of Atlanta ("City") appeals from a judgment of the United States District Court for the Northern District of Georgia holding the City in civil contempt for a violation of the terms of a 1980 consent decree. The City also appeals from an award of attorneys' fees pursuant to that judgment. We affirm the district court on both judgments.

This is a Title VII race discrimination class action with a lengthy and involved history. The case was instituted in 1973 by Floyd Reeves, a black officer of the Atlanta Bureau of Police Services ("Bureau"), who sought to represent black persons who were not hired as police officers by the City. A similar action was filed by the Afro-American Patrolmen's League ("AAPL"), which organization also sought to represent black applicants for positions as police officers with the Bureau.[1] Several individuals and organizations were allowed to intervene in both district court suits, including the appellee, the Fraternal Order of Police ("FOP"), an organization representing white police officers as well as white applicants for positions as police officers.

Each of the plaintiffs and intervenors sought damages as well as injunctive relief based on allegations of discrimination and reverse discrimination by the City in its hiring and promotions in the Bureau. On November 5, 1979, the parties presented a proposed consent decree to the district court for the purpose of settling both cases. The district court held a fairness hearing on December 20, 1979, and on June 13, 1980, the court approved the agreement.

The consent decree approved by the court resolved all issues raised by the parties in these suits. Specifically, it established guidelines for entry-level hiring, provided equitable and monetary relief for those applicants, black and white, who were rejected by the Bureau during the pertinent periods, and, as the principal concern of this appeal, it established procedures for promotions within the Bureau. Pursuant to Section IV of the consent decree the City agreed to retain an independent consulting firm to assist in development of the Bureau's promotion process for the positions of captain, lieutenant and sergeant. According to the decree the process should include a validated, culture-free, written examination and the City specifically agreed that "race shall play no part in the promotion process." The parties stipulated that as soon as the process was ready for use it would be utilized for a one-time-only series of promotions for remedial purposes pursuant to detailed guidelines set forth in the decree. Subsequent promotions were to be made following the same or a revised process with revisions being made only upon advance notice to the parties. The fact that race would play no part in the promotion process was specifically restated with respect to subsequent promotions.

The City hired the firm of McCann Associates, Inc. ("McCann") to develop written promotion examinations in compliance with the agreement. These examinations were developed and administered in 1981 and 1982 for purposes of the one-time-only promotions and these promotions were made without any complaints.

In 1984 the City identified a need to fill eight lieutenant and forty-six sergeant vacancies within the Bureau. To this end the City again hired McCann and also hired an additional consultant, Psychological Resources, to aid in this task. Beginning in December, 1984 police sergeant and lieutenant examinations were given in two parts. All candidates took the written examinations prepared by McCann and those who passed were given a video exam entitled "Critical Incident Response Assessment" which had been developed by Psychological Resources. After a list of the top performers on the combined exams was produced the City discovered that the passage rate for black officers on the two exams was less than 80% of the passage rate for white officers. Due to this ad-

---

1. Although these two actions were not formally consolidated at the district court level they were so treated, and have been consolidated for appeal.

verse racial impact the City postponed announcing any promotions and hired two new consultants to evaluate the tests. Based on the reports from the two additional consultants, the City decided to abandon the promotion process and so informed the district court and the parties by letter dated March 22, 1985:

> It is the opinion of the Commissioner of Public Safety that he is compelled by the order of June 13th, 1980 in the above referenced case to abandon the existing promotional process. Accordingly, no promotions will be made as a result of the existing examination process.... Nevertheless, the City will immediately move forward with a new promotional process.... As soon as these new procedures are identified, we will advise the court and counsel for all parties.

(ROA, vol. 1, § 7 (exhibit IV))[2]

On April 7, 1985, the FOP filed a motion in district court for an order compelling the City to promote officers to the ranks of sergeant and lieutenant in accordance with the results of the examinations administered in December, 1984 and January, 1985. The FOP also moved to hold the City in contempt of the June 13, 1980, court order. On June 17, 1985, after a hearing, the district court entered an oral order holding the City in contempt. The district court did not rule on the issue of the validity or invalidity of the examination process, but instead directed the parties to confer in an attempt to agree upon a method to be employed in making the promotions. The City met with the AAPL and the FOP and a proposed consent decree was agreed upon by the parties "resolv[ing] all claims which were or could have been raised by the FOP and AAPL, and the subclasses that they represent, concerning the examination process administered by the City of Atlanta in December 1984 and January 1985, and all defenses thereto of City of Atlanta." (ROA, vol. 2, § 28, p. 17.) The consent decree also provided for attorneys' fees for the FOP and the AAPL for all services provided after July 17, 1985, the date of the contempt order. Following a fairness hear-

ing the district court issued an order on December 18, 1985, approving the agreement. Subsequent to the finding of contempt the FOP filed an application for attorneys' fees and costs incurred prior to July 17, 1985. The district court awarded a total of $104,351.97 to the FOP on this application. The City appeals both the finding of contempt and the award of attorneys' fees.

In reviewing the district court's finding of contempt we must first address the FOP's contention that the issue of contempt is now moot due to the subsequent agreement reached by the parties and approved by the court on December 18, 1985. Through this new consent decree the parties established the method of promoting those candidates who were tested in December 1984 and January 1985. Because the agreement resolved all issues stemming from the FOP's motion for contempt, and because the agreement has been complied with, the FOP contends that it is outside the court's power to review the contempt judgment.

Article III of the Constitution conditions the exercise of federal judicial power upon the existence of a case or controversy. As a result of Article III's proscription, federal courts are without authority to decide questions which cannot affect the rights of the parties before the court. *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). In *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), the Supreme Court outlined the two conditions which together result in mootness:

> [J]urisdiction, properly acquired, may abate if the case becomes moot because
>
> (1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur ... and
>
> (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*Id.*, 440 U.S. at 631, 99 S.Ct. at 1383, 59 L.Ed.2d at 649, quoting *United States v.*

---

**2.** All references to the Record on Appeal ("ROA") are to the record in Case No. 85–8826.

*W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303, 1309 (1953).

In the present case the district court found the alleged violation to be the "complete abandonment of the promotional processes which had then been engaged in ... [without the City fulfilling its duty] to determine whether or not the examination was culture free, and whether or not it could be validated." (ROA, vol. 1, § 23, p. 3 & 6.) The finding of contempt is not moot because it cannot be said with assurance that there is no expectation that this alleged violation will recur. The consent agreement entered into subsequent to the finding of contempt only controlled the method of promoting those officers who took the examinations in December 1984/January 1985. Under the initial consent decree, however (upon which the finding of contempt is based), the district court has a continuing role in the promotion process which control has been extended for an additional seven years. Clearly a ruling by this court on the finding of contempt is necessary to guide the City in its efforts to comply with the initial consent decree. Consequently, a review of the merits of the order finding the City in contempt of the 1980 consent decree is necessary.

The standard of review on appeal from a grant or denial of a civil contempt motion is whether the district court abused its discretion. *In re Newton*, 718 F.2d 1015 (11th Cir.1983).[3] This standard requires the petitioner to prove by clear and convincing evidence that the respondent violated the court's prior order. *Id.* at 1022.

The district court found that when the City abandoned the agreed upon promotional process on March 22, 1985, it was with-

out sufficient available information to determine whether the process could be validated. The district court based its order of contempt on its finding that § IV(A)(1) of the consent decree required the City to make a good faith determination as to whether the exams were content-valid before abandoning them.[4] On appeal the City maintains that it had no duty to validate the exams and that assuming arguendo any such duty existed, the tests could not be validated and its abandonment was therefore justified. These two arguments are addressed separately.

In contending that it had no duty to validate, the City relies on the fact that a significant adverse racial impact was demonstrated by the exams. According to the City, once the adverse impact was determined, it was then free to abandon the exams, without any duty to attempt validation. The City analogizes its abandonment of the exams to affirmative action, and for support relies primarily on *Bushey v. New York State Civil Service Commission*, 733 F.2d 220 (2d Cir.1984), *cert. denied*, 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985).

In *Bushey* non-minority candidates for positions of corrections captain brought suit against the state of New York alleging that the state's adjustment of minority candidates' raw test scores discriminated against non-minority candidates in violation of Title VII and the fourteenth amendment. The state had adjusted these scores after a finding of adverse racial impact. The district court held that before the state could take such voluntary action, it was required to 1) make out a prima facie case of adverse impact and 2) prove that this prima

---

**3.** In reviewing a contempt judgment the court must first determine whether the nature of the contempt proceeding was civil or criminal. *Smith v. Sullivan,* 611 F.2d 1050 (5th Cir.1980). Because the court's directive that the parties confer in order to reach an agreement was obviously remedial, the initial judgment was civil. *Id.* at 1053; *United States v. Rizzo,* 539 F.2d 458, 463 (5th Cir.1976).

**4.** Section IV(A)(1) provides as follows:
 The City agrees that an outside consulting firm will be engaged to assist in the further development of the Bureau's promotion pro-

cess for the positions of captain, lieutenant and sergeant. Such process shall include a written examination, which the City expects to be culture-free, validated for content, and after a reasonable period of time, validated for the Bureau in accordance with the standards of Title VII of the Civil Rights Act of 1964. The city agrees that in this promotion process race shall play no part and shall be no criterion or factor other than as appropriate to facilitate the agreement herein.
(ROA, vol. 1, § 5, att.)

facie case was not rebuttable by evidence of test job validity. The Second Circuit Court of Appeals reversed, emphasizing that in the context of Title VII voluntary compliance is to be encouraged. According to the court of appeals, the employer need not prove inability to rebut, instead "a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for employer-initiated, voluntary race-conscious remedies." *Id.* at 228.

■ The reasoning in *Bushey* is inapposite to the facts of this case. The parties in *Bushey* were not under a court order requiring them to insure that race played no part in their promotion decisions and were therefore free to institute race-conscious remedies. Here, the City did not attempt to initiate any "remedies," race-conscious or otherwise, but instead merely abandoned a procedure it had agreed to in the consent decree.[5] The sole issue then is whether by such abandonment the City failed to fulfill its duties under the June 1980 consent decree. We hold that it did. Once an adverse racial impact was discovered, it was incumbent upon the City to engage in a good faith effort to determine whether the exams were free of culture bias and whether they could be validated for content. Without making such an effort it would be impossible for the City to know which alternative—abandonment of the results or promotions based on the results—would be the racially neutral option. Assuming the exams could be validated for content and showed no culture bias, then race would not be a factor in promotions based on the results of the exams. In fact, in this instance abandonment of the results would indicate that race was a factor in the process, as such action could only be justified by the fact that blacks failed to perform as well as whites on the exams. If, however, the exams did not prove to be culture-free and content-valid then race would be implicated as a factor in the results and pro-

motions based on these results would be in violation of the decree. Indeed, in this case abandonment would be justified to avoid promotions in which race was a factor. Therefore, in order to determine how to comply with the consent decree's mandate that race play no part in its promotion process the City was obligated to engage in a good faith effort to determine whether the exams were culture-free and content-valid.

We recognize the difficult position in which the City found itself upon discovery of adverse racial impact. It could reasonably expect a lawsuit from either party, dependent on its actions. However, it is precisely because the consent decree required nondiscriminatory treatment of both minority and non-minority officers/applicants that the City is required to justify its employment decisions to both sides. Accordingly, we affirm the district court's conclusion that once adverse racial impact was discovered, the City had a duty, pursuant to § IV(A)(1) of the agreement, to examine the tests for content validity and culture-bias before deciding to abandon them.

■ The City's second argument urges that assuming such a duty, the district court erred in holding that it failed to meet its obligation. According to the district court, the City's letter of March 22, 1985, amounted to a complete abandonment of the agreed upon promotion plan and the City had no intention at that time to salvage any part of the process. The court also found that at that time the City had insufficient evidence to sustain an abandonment of the process. These factual determinations by the district court are subject to reversal only if clearly erroneous. *United States v. United States Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–42, 92 L.Ed. 746, 765–66 (1948); *Hardin v. Stynchcomb,* 691 F.2d 1364, 1372 (11th Cir. 1982). The City has presented nothing on appeal which would indicate that the

5. In this regard the City emphasizes the fact that no promotions were made when the test was abandoned, arguing that, therefore, no rights of

non-minority candidates were violated. For the reasons stated herein we disagree.

court's findings in this record were clearly erroneous. To the contrary both findings of the district court are clearly supported by the evidence.

Although the City did present evidence that certain consultants believed the tests could not be validated, the only relevant evidence is what was known on or before March 22, 1985, the date the City abandoned the process. Prior to that date the developers of the two exams believed the exams could be defended. Of the other two consultants, one, Dr. Hilliard of Georgia State University, whose testimony was not produced at the contempt hearing, believed the test could not be validated. The other consultant, Dr. Boyles of Auburn University, testified that as of March 22, 1985, he had not told the City that the process was invalid. In fact, a review by Auburn University personnel of the validity of the McCann examination was underway during the contempt hearing. Based on the evidence in the record we must reject the City's argument that the district court erred in concluding that the City failed to meet its obligation under the agreement.

 In addition to appealing the contempt judgment, the City also challenges the district court's award of $104,351.97 as compensation for attorneys' fees and costs incurred prior to July 17, 1985. The City first argues that attorneys' fees are precluded by a "special circumstance" exception to the allowance of attorneys' fees provided by Title VII.[6] The special circumstance cited by the City is the fact that the FOP achieved only limited success. The limitation to which the City refers is the fact that the FOP sought to have the promotions made in accordance with the results of the exams administered, a goal never attained by the FOP. This limitation does not fall within the narrow exception for special circumstances, *see Ellwest Stereo Theatre, Inc. v. Jackson,* 653 F.2d 954 (5th Cir. Unit B 1981) (42 U.S.C. § 1988). Moreover, the district court correctly concluded that this limitation is more properly a consideration under the factors enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

In a similar vein the City also claims that due to the limitations on the FOP's success it should not be considered to have prevailed and the attorneys' fees award should, therefore, be adjusted downward. In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) the Supreme Court stated that "[a] typical formulation is that plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* at 433, 103 S.Ct. at 1939, 76 L.Ed.2d at 50. By prevailing on the contempt motion and achieving a consent agreement resolving the issue of promotions, the FOP prevailed to the extent necessary for an award of attorneys' fees pursuant to Title VII.

 Finally, the City argues that the hours expended by counsel for the FOP were unreasonable and duplicative. Again the City stresses the fact that the FOP did not prevail on all issues. It contends that since the court did not rule on the validity or invalidity of the exam, any portion of the award which is compensation for time spent on this issue should be deleted. The FOP claims that fee awards are appropriate for hours related to claims involving a common core of facts with claims upon which a plaintiff prevailed. As stated in *Jones v. Diamond,* 636 F.2d 1364 (5th Cir. 1981), "[i]n fixing the fee, the district court should be mindful that in complex civil rights litigation ... issues are overlapping and intertwined." *Id.* at 1382. In this respect the district court found that the issue of validity was intertwined with the issue of whether the City should have abandoned the process. The City has presented no evidence to dispute this factu-

---

6. Title VII permits an award of attorneys' fees and expenses in the following language:

In any action or proceeding under this subchapter, the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C.A. § 2000e–5(k) (West 1981)

al determination and we decline to reduce the fee award on the basis of unreasonableness.

The city also contends that the time for which compensation is sought is duplicative. The standard for elimination of duplicative time is stated as follows:

> [a] reduction [in a fee] is warranted only if the attorneys are *unreasonably* doing the *same* work. An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation.

*Johnson v. University College*, 706 F.2d 1205, 1208 (11th Cir.1983). The City does not dispute that counsel actually spent the claimed time preparing the case, or that the work could have reasonably been performed in fewer hours. Rather, the city appears to argue that because the two attorneys employed by the FOP had distinct areas of expertise (one in validation, one in trial work) any time spent by one on the other's area was duplicative. The district court found that the city had failed to provide any evidence of actual duplication and none has been presented on appeal. In sum, we find that the district court correctly considered the factors enunciated in *Johnson v. Georgia Highway Express, Inc., supra,* and did not abuse its discretion. We affirm the district court's award of attorneys' fees.

The contempt judgment entered by the district court and its award of attorneys' fees are

AFFIRMED.