**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: December 10, 2007   Decided: June 9, 2008
                                            Order issued: June 12, 2008)

Docket No. 06-4996-cv

- - - - - - - - - - - - - - - - - - - - -X

FRANK RICCI, MICHAEL BLATCHLEY, GREG
BOIVIN, GARY CARBONE, MICHAEL
CHRISTOFORO, RYAN DIVITO, STEVEN
DURAND, WILLIAM GAMBARDELLA, BRIAN
JOOSS, JAMES KOTTAGE, MATTHEW
MARCARELLI, THOMAS J. MICHAELS, SEAN
PATTON, CHRISTOPHER PARKER, EDWARD
RIORDAN, KEVIN ROXBEE, TIMOTHY SCANLON,
BENJAMIN VARGAS, JOHN VENDETTO AND MARK
VENDETTO,

          Plaintiffs-Appellants,

          - v.-

JOHN DESTEFANO, KAREN DUBOIS-WALTON,
THOMAS UDE JR., TINA BURGETT, BOISE
KIMBER, MALCOM WEBER, ZELMA TIRADO AND
CITY OF NEW HAVEN,

          Defendants-Appellees

- - - - - - - - - - - - - - - - - - - - -X

**FOR PLAINTIFFS-APPELLANTS:** KAREN LEE TORRE, New Haven, CT

**FOR DEFENDANTS-APPELLEES:** RICHARD A. ROBERTS (Nicole C.

Chomiak, Stacey L. Pitcher, and Todd J. Richardson, on the brief), Cheshire, CT

**ORDER**

After disposition of this appeal by summary order dated February 15, 2008, an active judge of the Court requested a poll on whether to rehear the case in banc. A poll on whether to rehear the case in banc was conducted among the active judges of the Court. After the poll was concluded, on June 9, 2008, the original three-judge panel withdrew the summary order and filed a per curiam opinion; no subsequent in banc poll has been requested. Because a majority of the court's active judges voted to deny rehearing in banc, rehearing in banc is hereby DENIED.

Judges Calabresi, Straub, Pooler, Sack, Sotomayor, Katzmann, and B.D. Parker concur in the denial of rehearing in banc. Chief Judge Jacobs and Judges Cabranes, Raggi, Wesley, Hall and Livingston dissent from the denial of rehearing in banc.

With this order, Judge Katzmann is filing a concurring opinion, in which Judges Pooler, Sack, Sotomayor and B.D. Parker joins; Judge B.D. Parker is filing a concurring opinion, in which Judges Calabresi, Pooler, Sack

2

and Sotomayor join; and Judge Cabranes is filing a dissenting opinion, in which Chief Judge Jacobs and Judges Raggi, Wesley, Hall and Judge Livingston join.

Other opinions may be filed with respect to this case, concurring or dissenting in the denial of in banc review.

KATZMANN, *Circuit Judge*, with whom Judge POOLER, Judge SACK, Judge SOTOMAYOR, and Judge B.D. PARKER join, concurring in the denial of rehearing en banc:

I concur in the denial of rehearing en banc, consistent with our Circuit's longstanding tradition of general deference to panel adjudication – a tradition which holds whether or not the judges of the Court agree with the panel's disposition of the matter before it. Throughout our history, we have proceeded to a full hearing en banc only in rare and exceptional circumstances. *See* Wilfred Feinberg, *Unique Customs and Practices of The Second Circuit*, 14 Hofstra L. Rev. 297, 311-12 (1986). The Supreme Court now has before it a petition for certiorari in this case, which I recognize presents difficult issues. As the Supreme Court decides whether to grant certiorari, it has for its review the district court's opinion, the panel's per curiam opinion, and opinions concurring with and dissenting from the decision denying rehearing en banc. The issues are therefore sharply defined for the Supreme Court's consideration of whether to grant certiorari.

BARRINGTON D. PARKER, *Circuit Judge*, with whom Judge CALABRESI, Judge POOLER, Judge SACK, and Judge SOTOMAYOR join, concurring in the denial of rehearing *en banc*:

At the heart of the dissent from the denial of rehearing *en banc* is the assertion that there was no Supreme Court or circuit law to guide this district court, or future district courts faced with similar claims. I disagree. The district court correctly observed that this case was unusual. Nonetheless, the district court also recognized that there was controlling authority in our decisions—among them, *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999) and *Bushey v. N.Y. State Civil Serv. Comm'n*, 733 F.2d 220 (2d Cir. 1984), *cert. denied*, 469 U.S. 1117 (1985). These cases clearly establish for the circuit that a public employer, faced with a *prima facie* case of disparate-impact liability under Title VII, does not violate Title VII or the Equal Protection Clause by taking facially neutral, albeit race-conscious, actions to avoid such liability.

Insofar as the dissent suggests that the plaintiffs produced evidence of a racial classification or the imposition of a quota, I think it entirely mistaken. Although the City acted out of a concern that certifying the exam results would have an adverse impact on minority candidates—and although, as the panel noted in its decision, the result was understandably frustrating for applicants who passed the test—the City's response, to decline to certify any of the exams, was facially race-neutral. The City did not classify or confer any actual benefit on applicants on the basis of race. The dissent's citations to *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), are

1

therefore inapposite.[1] *See Hayden*, 180 F.3d at 49 (distinguishing those cases as "concerned with *select* affirmative action tools, such as quota systems, set-aside programs, and differential scoring cutoffs, which utilize express racial classifications and which prevent non-minorities from competing for specific slots or contracts.").

Because there was no racial classification, the plaintiffs bore the burden of persuasion on the issue of discriminatory purpose. *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006). Here, however, there was no evidence of a discriminatory purpose; according to the record evidence, the City was motivated by a desire to comply with, and avoid liability under, Title VII and its implementing regulations. *See Bushey*, 733 F.2d at 226 ("It is settled that voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination." (internal quotation marks and alteration omitted)); *see also Hayden*, 180 F.3d at 51 ("A desire to reduce the adverse impact on [minority] applicants . . . is not analogous to an intent to discriminate against non-minority candidates.").

I think the dissent also quite unfairly caricatures the district court's evaluation of the plaintiffs' Title VII claim: "Under the District Court's rationale, it appears that any race-based employment decision undertaken to avoid a threatened or perceived Title VII lawsuit is itself

---

[1] It may be worth noting that the *Croson* Court based its decision partly on the fact that "[t]here [was] nothing approaching a prima facie case of a constitutional or statutory violation by *anyone* in the Richmond construction industry." *Croson*, 488 U.S. at 500. Here, by contrast, the City was faced with a *prima facie* case of a violation of Title VII. *See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006) (defining *prima facie* case of disparate-impact liability under Title VII); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001) (same); *see also* 42 U.S.C. § 2000e-2(k) (codifying the disparate-impact theory of liability and legislatively overruling *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659 (1989)).

immune from scrutiny under Title VII." This is simply not the case. Prior to reaching its conclusion, the district court assessed whether the examination results demonstrated a statistically disproportionate adverse racial impact under the EEOC Guidelines and whether the City had presented evidence to support its belief that less discriminatory alternatives to this particular test existed. This analysis shows that, contrary to the dissent's suggestion, the district court did not rubber stamp the City's proffered non-discriminatory reason for not certifying the exam results.

Moreover, I hardly think that in order to decline to certify the exam results, the City was required to *prove*, through a validation study or some other means, that its own tests were not "job related for the position in question and consistent with business necessity," 42 U.S.C. § 2000e-2(k)(1)(A)(i) (defining affirmative defense to *prima facie* case of disparate impact violation). In fact, our case law explicitly rejects that proposition. *See Bushey*, 733 F.2d at 226 (disagreeing with the assertion that "before adopting remedial measures" the employer must "prove that [the] prima face case [of a disparate-impact Title VII violation] was not rebuttable through job-related explanations").

I also disagree with the dissent's view that *en banc* review is warranted because the district court analyzed the plaintiff's claims using the *McDonnell Douglas* pretext test rather than the *Price Waterhouse* mixed-motive test. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As the dissent is well aware, the plaintiffs did not argue the mixed-motive theory; a non-party raised it in an amicus brief. "Although an *amicus* brief can be helpful in elaborating issues properly presented by the parties,

3

it is normally not a method for injecting new issues into an appeal, at least in cases where the parties are competently represented by counsel." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001); *see also Bano v. Union Carbide Corp.*, 273 F.3d 120, 127 n.5 (2d Cir. 2001) (same).

Finally, the dissent suggests that the panel's per curiam opinion inappropriately adopted the reasoning set forth in the district court's opinion, one that the panel recognized was "thorough, thoughtful, and well-reasoned." The adherence of a Court of Appeals to the decision and reasoning of a district court is anything but novel. In fact, the practice pre-dates the formal establishment of this Court in 1891 by at least fifty years. *United States v. Libellants & Claimants of the Schooner Amistad*, 40 U.S. 518, 590 (1841) ("The Circuit Court, by a mere pro forma decree, affirmed the decree of the [Connecticut] District Court . . . . And from that decree the present appeal has been brought to this Court."). This Court has followed this practice on numerous occasions in appeals covering myriad issues. *See, e.g., In re Bankers Trust Co.*, 450 F.3d 121, 123 (2d Cir. 2006) (per curiam); *Murphy ex rel. Estate of Payne v. United States*, 427 F.3d 158, 159 (2d Cir. 2005) (per curiam); *In re Red Dot Scenic, Inc.*, 351 F.3d 57, 58 (2d Cir. 2003) (per curiam); *United States v. Gluzman*, 154 F.3d 49, 50 (2d Cir. 1998); *Trans World Airlines, Inc. v. Sinicropi*, 84 F.3d 116, 116 (2d Cir.) (per curiam), *cert. denied*, 519 U.S. 949 (1996).

The plaintiffs were entitled to a careful and thoughtful review of their claims. The panel decided that the district court had given them just that, and thus adopted the district court's reasoning in its per curiam opinion. Nothing more is required.

4

JOSÉ A. CABRANES, *Circuit Judge,* with whom Chief Judge JACOBS, Judge RAGGI, Judge WESLEY, Judge HALL, and Judge LIVINGSTON join, dissenting:

This appeal raises important questions of first impression in our Circuit—and indeed, in the nation—regarding the application of the Fourteenth Amendment's Equal Protection Clause and Title VII's prohibition on discriminatory employment practices. At its core, this case presents a straight-forward question: May a municipal employer disregard the results of a qualifying examination, which was carefully constructed to ensure race-neutrality, on the ground that the results of that examination yielded too many qualified applicants of one race and not enough of another? In a path-breaking opinion, which is nevertheless unpublished, the District Court answered this question in the affirmative, dismissing the case on summary judgment. A panel of this Court affirmed in a summary order containing a single substantive paragraph. *Ricci v. DeStefano,* No. 06-4996-cv (2d Cir. Feb. 15, 2008).[1] Three days prior to the filing of this opinion, the panel withdrew its summary order and filed a *per curiam* opinion adopting *in toto* the reasoning of the District Court, thereby making the District Court's opinion the law of the Circuit. *See Ricci v. DeStefano,* __ F.3d __ (2d Cir. 2008).

The use of *per curiam* opinions of this sort, adopting in full the reasoning of a district court without further elaboration, is normally reserved for cases that present straight-forward questions that do not require explanation or elaboration by the Court of Appeals. The questions raised in this appeal cannot be classified as such, as they are indisputably complex and far from well-settled. These questions include: Does the Equal Protection Clause prohibit a municipal employer from discarding examination results on the ground that "too many" applicants of one race received high scores and in the hope that a future test would yield more high-scoring applicants of other races? Does such a

---

[1] Reproduced as Appendix A.

1

practice constitute an unconstitutional racial quota or set-aside? Should the burden-shifting framework applicable to claims of pretextual discrimination ever apply to a claim of explicit race-based discrimination in violation of Title VII? If a municipal employer claims that a race-based action was undertaken in order to comply with Title VII, what showing must the employer make to substantiate that claim? Presented with an opportunity to address *en banc* questions of such "exceptional importance," Fed. R. App. P. 35(a)(2), a majority of this Court voted to avoid doing so.

I respectfully dissent from that decision, without expressing a view on the merits of the questions presented by this appeal, in the hope that the Supreme Court will resolve the issues of great significance raised by this case.

## BACKGROUND

In late 2003, 118 applicants took a written and oral examination administered by the New Haven Fire Department ("NHFD") for promotion to the ranks of Captain and Lieutenant. Forty-one applicants took the Captain examination, of whom twenty-five were white, eight black, and eight Hispanic. Based on the examination results and New Haven's protocol for civil service promotions, it appeared, at the time that the tests were scored, that "no blacks and at most two Hispanics would be eligible for promotion" to Captain. *Ricci v. DeStefano*, No. 04cv1109, at 3 (D. Conn. Sept. 28, 2006).[2] With respect to the Lieutenant examination, the racial composition of the seventy-seven applicants was as follows: forty-three whites, nineteen blacks, and fifteen Hispanics. The examination results indicated that no blacks or Hispanics would be promoted to the rank of Lieutenant. Between January and March 2004, the New Haven Civil Service Board ("CSB") held hearings to determine whether to certify the examination results and confer promotions according to those results. Despite the substantial efforts undertaken by the examination designer to ensure that it would be race-neutral, the City of New Haven

---

[2] Reproduced as Appendix B.

2

(the "City") frankly stated its fear that, if the results were certified, it would face an employment discrimination lawsuit from non-white applicants who were not promoted. The CSB did not certify the examination results, and no promotions were made.

Eighteen candidates—seventeen whites and one Hispanic—brought an action in the U.S. District Court for the District of Connecticut. They alleged in their complaint that the City and several municipal officials—acting in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and other provisions of federal and state law—disregarded the results of two promotional examinations that produced "too many" eligible white candidates and "too few" eligible non-white candidates. On cross-motions for summary judgment, the District Court (Janet Bond Arterton, *Judge*) granted defendants' motion for summary judgment, denied plaintiffs' motion, and directed the Clerk of Court to close the case.

In a forty-eight page opinion, the District Court observed that (1) "[p]laintiffs' evidence—and defendants' own arguments—show that the City's reasons for advocating non-certification [of the examination results] were related to the racial distribution of the results" and (2) "[a] jury could infer that the defendants were motivated by a concern that too many whites and not enough minorities would be promoted were the [eligibility] lists to be certified." *Ricci*, No. 04cv1109, at 20-21. The District Court recognized the exceptional circumstances presented by the case, noting that it "presents the opposite scenario of the usual challenge to an employment or promotional examination, as plaintiffs attack not the use of allegedly racially discriminatory exam results, but defendants' reason for their *refusal* to use the results." *Id.* at 22. Applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the District Court held that "[d]efendants' motivation to avoid making promotions based on a test with a racially disparate impact, even in a

3

political context, does not, as a matter of law, constitute discriminatory intent, and therefore such evidence is insufficient for plaintiffs to prevail on their Title VII claim." *Ricci*, No. 04cv1109, at 39-40 (footnote omitted).

The District Court further concluded that defendants had not violated plaintiffs' rights under the Equal Protection Clause by, as plaintiffs alleged, "employing a race-based classification system for promotion or, alternatively, by applying facially neutral promotion criteria in a racially discriminatory manner." *Id.* at 40, 44. Although it is not disputed that the decision to discard the examination results was based on racial considerations, the District Court determined as a matter of law that no racial discrimination had occurred "because [all of] the test results were discarded and nobody was promoted," *id.* at 42, and because "[n]othing in the record in this case suggests that the City defendants or CSB acted 'because of' discriminatory animus toward plaintiffs or other non-minority applicants for promotion," *id.* at 43. The District Court also rejected plaintiffs' civil rights conspiracy and First Amendment claims and declined supplemental jurisdiction over a state law tort claim.

On appeal, the parties submitted briefs of eighty-six pages each and a six-volume joint appendix of over 1,800 pages; plaintiffs' reply brief was thirty-two pages long. Two *amici* briefs were filed and oral argument, on December 10, 2007, lasted over an hour (an unusually long argument in the practice of our Circuit). More than two months after oral argument, on February 15, 2008, the panel affirmed the District Court's ruling in a summary order containing a single substantive paragraph. The operative portion of the summary order read as follows:

> We affirm, substantially for the reasons stated in the thorough, thoughtful, and well-reasoned opinion of the court below. In this case, the Civil Service Board found itself in the unfortunate position of having no good alternatives. We are not unsympathetic to the plaintiffs' expression of frustration. Mr. Ricci, for example, who is dyslexic, made intensive efforts that appear to have resulted in his scoring highly on one of the exams, only to have it invalidated. But it simply does not follow that he has a viable Title VII claim. To the contrary, because the Board, in refusing to validate the exams, was simply trying to fulfill its obligations under Title VII

4

when confronted with test results that had a disproportionate racial impact, its actions were protected.

The judgment of the district court is AFFIRMED.

*See* App. A. Four months later, and three days prior to the publication of this opinion, the panel withdrew its summary order and published a *per curiam* opinion that contained the same operative text as the summary order, with the addition of a citation to the District Court's opinion in the Westlaw and LexisNexis databases. This *per curiam* opinion adopted *in toto* the reasoning of the District Court, without further elaboration or substantive comment, and thereby converted a lengthy, unpublished district court opinion, grappling with significant constitutional and statutory claims of first impression, into the law of this Circuit. It did so, moreover, in an opinion that lacks a clear statement of either the claims raised by the plaintiffs or the issues on appeal. Indeed, the opinion contains no reference whatsoever to the constitutional claims at the core of this case, and a casual reader of the opinion could be excused for wondering whether a learning disability played at least as much a role in this case as the alleged racial discrimination. This perfunctory disposition rests uneasily with the weighty issues presented by this appeal.[3]

Prior to the entry of the *per curiam* opinion and in light of the "question[s] of exceptional importance," Fed. R. App. P. 35(a)(2), raised in this appeal, the Court considered a motion for *en banc* review. A majority of this Court declined to take up the appeal.

## DISCUSSION

---

[3] Judge Parker's observation that "[t]he adherence of a Court of Appeals to the decision and reasoning of a district court is anything but novel" cannot be gainsaid. In appropriate cases, such a disposition is entirely unobjectionable. Where significant questions of unsettled law are raised on appeal, however, a failure to address those questions—or even recognize their existence—should not be the approved modus operandi of the U.S. Court of Appeals.

5

The core issue presented by this case—the scope of a municipal employer's authority to disregard examination results based *solely* on the race of the successful applicants—is not addressed by any precedent of the Supreme Court or our Circuit. Plaintiffs alleged that the City's actions violated, *inter alia*, their rights under the Equal Protection Clause and Title VII. The District Court disagreed, but did so without the benefit of pertinent guidance from a higher court. The questions raised by the instant appeal clearly merit further review.[4]

## A.    The Equal Protection Clause

Plaintiffs claim that the City's decision to discard the examination results was race-based discrimination in violation of the Equal Protection Clause because it was undertaken solely to reduce the number of high-scoring white applicants and increase the number of eligible non-white candidates. Defendants contend that their decision, though race-based, was necessary because compliance with federal anti-discrimination laws required them to reduce the number of eligible white candidates. *See Ricci*, No. 04cv1109, at 20-21; Appellee Br. at 15-20, 30-31. The Supreme Court has addressed a government entity's claim that race-based decisions were necessary to redress a racial imbalance in the closely analogous context of government contracts. In *City of Richmond v. J. A. Croson Co.*, the Supreme Court held that: "[w]hile there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts . . . ." 488 U.S. 469, 499 (1989). The Court further observed that:

> [W]hen a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals. A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists. The history of racial classifications in this country suggests that blind judicial

---

[4] Indeed, in his opinion concurring in the *denial* of *en banc* review, Judge Katzmann recognizes as much, observing that this appeal "presents difficult issues."

deference to legislative or executive pronouncements of necessity has no place in equal protection analysis.

*Id.* at 500-01 (internal citations omitted). More recently, the Supreme Court has identified "three general propositions with respect to governmental racial classifications." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223 (1995). They are:

> First, skepticism: Any preference based on racial or ethnic criteria must necessarily receive a most searching examination. Second, consistency: The standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification, *i.e.*, all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized. And third, congruence: Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment. Taken together, these three propositions lead to the conclusion that *any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.*

*Id.* at 223-24 (quotation marks, internal citations, and brackets omitted) (emphasis added).

Whether the District Court's judgment comports with these propositions is a question of immense importance that is not addressed in the panel's *per curiam* opinion. The District Court's ruling rested in part on the premise that "where a test is administered and scored in the same manner for all applicants, plaintiffs cannot make out a claim that the exam was a facially neutral test used in a discriminatory manner." *Ricci*, No. 04cv1109, at 42. Neutral administration and scoring—even against the backdrop of race-conscious *design* of an employment examination, *see Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999)—is one thing. But neutral administration and scoring that is followed by race-based treatment of examination results is surely something else entirely. Where, as here, examination results are *disregarded* on the ground that too many candidates of one race qualified for promotion on the basis of those results, the fact of neutral administration and scoring may not necessarily immunize defendants from the claims of civil rights violations brought by plaintiffs. If it did, municipal employers could reject the results of an employment examination whenever those results

7

failed to yield a desired racial outcome—*i.e.*, failed to satisfy a racial quota. *Croson* and *Adarand* establish that racial quotas are impermissible under the Constitution absent specific findings of past discrimination that are not in the record here. Whether *Croson* and *Adarand* preclude the actions challenged in this case, or whether *Hayden* can fairly be read to compel judgment in defendants' favor as a matter of law, are questions that admit no easy answer. As such, they require the careful analysis of a full opinion of an appellate court, not abbreviated disposition.

The District Court held that the test was administered in the same manner for all applicants because the City discarded the scores of all exam-takers. Insofar as the decision to not certify the results was based on the race of the high-scoring applicants, however, it is arguable that the deck was stacked against applicants of that race: If too many white applicants obtained high scores, the City stood ready to nullify the results in the hope that non-white applicants would score relatively higher on a subsequent examination.[5] Whether such action amounts to an impermissible racial quota was not addressed in the District Court's opinion or in the decisions issued by the panel, which do not even note that this action arises under the Equal Protection Clause of the Fourteenth Amendment. *See* App. A (summary order of Feb. 15, 2008); *per curiam* opinion filed on June 9, 2008.

The District Court also held as a matter of law that none of the City's reasons for disregarding the examination results amounted to intentional discrimination because the City had

> acted based on the following concerns: that the test had a statistically adverse impact on African-American and Hispanic examinees; that promoting off of this list would undermine their goal of diversity in the Fire Department and would fail to develop managerial role models for aspiring firefighters; that *it would subject the City to public criticism*; and that it would likely subject the City to Title VII *lawsuits from minority applicants that, for political reasons, the City did not want to defend.*

---

[5] In his opinion concurring in the denial of *en banc* review, Judge Parker concludes that the City "did not . . . confer any actual benefit on applicants on the basis of race." It is, at the very least, an open question whether discarding examination results on the basis of race so that members of certain races could have a "second chance" to compete constitutes the conferral or denial of a benefit on the basis of race.

8

*Ricci*, No. 04cv1109, at 43 (emphasis added). Leaving aside the propriety of the District Court's evaluation, on summary judgment, of the City's motives—a quintessential question of fact, *see, e.g., Hunt v. Cromartie*, 526 U.S. 541, 552-53 (1999)—it is at least arguable that the District Court failed to subject the City's justifications to the "most searching examination" prescribed by the *Adarand* Court. *See* 515 U.S. at 223. The record suggests that the District Court took the City's justifications at face value, as it appears Judge Parker has done in his opinion concurring in the denial of *en banc* review. An appellate court ought to consider whether this level of scrutiny is consistent with Justice O'Connor's observation, in *Croson*, that "[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." 488 U.S. at 493 (plurality opinion). Justice O'Connor's cautionary note on "racial politics" is particularly relevant in light of the District Court's observation that fear of "public criticism" and other "political reasons" factored into the City's decision. Whether the District Court subjected the City's claims to sufficient scrutiny—and whether the City's claims could have withstood such scrutiny—are vital "question[s] of exceptional importance," Fed. R. App. P. 35(a)(2), that warrant further review, both for the proper resolution of this case and for the guidance of other courts and municipalities in future cases.

## B.     Title VII

Plaintiffs urge that the City's race-based action also violated Title VII's prohibition of employment discrimination. *See* 42 U.S.C. § 2000e-2. The District Court dismissed plaintiffs' Title VII claim by applying the three-step burden-shifting framework for adjudicating claims of pretextual discrimination established by *McDonnell Douglas*. The dismissal of the Title VII claim on this basis raises two significant questions: (1) whether the *McDonnell Douglas* test for *pretextual* discrimination should be

9

applied to claims of discrimination that is *overt*, and (2) whether a race-based decision allegedly made to

avoid perceived liability for racial discrimination is exempt from scrutiny under Title VII and, if not,

what quantum of proof is required to substantiate such a defense.

Courts generally apply *McDonnell Douglas* in cases where plaintiffs "present[] no direct evidence

of discriminatory treatment." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005); *see also*

*Graves v. Finch Pruyn & Co. Inc*, 457 F.3d 181, 187 (2d Cir. 2006). "If a plaintiff can convince the trier of

fact that an impermissible criterion in fact entered into the employment decision, [however,] a

somewhat different analysis takes place." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.

1992). In that kind of "mixed-motive" case, the burden-shifting analysis set forth in *Price Waterhouse v.*

*Hopkins*, 490 U.S. 228 (1989), governs the claim. Under this framework,

> the plaintiff . . . must focus his proof directly at the question of discrimination and prove that
> an illegitimate factor had a motivating or substantial role in the employment decision. If the
> plaintiff convinces the factfinder that the illegitimate factor played such a role, the employee
> has proved that the decision was made at least in part because of the illegitimate factor. At this
> point the employee is entitled to succeed subject only to the employer's opportunity to prove
> its affirmative defense; that is, that it would have reached the same decision as to the
> employee's employment even in the absence of the impermissible factor.

*Tyler*, 958 F.2d at 1181 (internal citations, quotation marks, and brackets omitted); *see also Sista v. CDC*

*Ixis N. Am., Inc.*, 445 F.3d 161, 173-74 (2d Cir. 2006); *Raskin v. Wyatt Co.*, 125 F.3d 55, 60-61 (2d Cir.

1997) ("Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy

documents and evidence of statements or actions by decisionmakers that may be viewed as directly

reflecting the alleged discriminatory attitude." (internal quotation marks omitted)).

The *Ricci* plaintiffs offered evidence that an impermissible factor—their race—motivated

defendants to discard the results of the employment examination. As the District Court itself candidly

observed: "[p]laintiffs' evidence—and defendants' own arguments—show that the City's reasons for

advocating non-certification [of the examination results] were related to the racial distribution of the

10

results" and "[a] jury could infer that the defendants were motivated by a concern that too many whites and not enough minorities would be promoted were the [eligibility] lists to be certified." *Ricci*, No. 04cv1109, at 20-21. The District Court's application of the *McDonnell Douglas* test for pretextual discrimination, its conclusion that plaintiffs cannot pass that test as a matter of law, and its failure to consider the possibility that defendants themselves might bear a burden of proof under the analysis set forth in *Price Waterhouse*, all raise serious concerns left unaddressed by the panel in its *per curiam* opinion and by the full Court, which declined *en banc* review of the appeal.

Assuming *arguendo* that a claim of overt racial discrimination is ever appropriately evaluated under the *McDonnell Douglas* framework for pretextual discrimination, the application of that framework to this case required a "reversal" of the usual roles assigned to plaintiffs and defendants in such cases. As the District Court observed:

> [T]his case presents the opposite scenario of the usual challenge to an employment or promotional examination . . . . Ordinarily, as contemplated by the statute, the "complaining party" bears the burden of proving a disparate impact, and the "respondent" bears the burden of "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity," or, alternatively, the "complaining party" may prevail by showing that an alternative employment practice with less disparate impact existed and that the respondent failed to utilize it. Here, the roles of the parties are in essence reversed, with the defendants, normally reflecting a "respondent" role in the Title VII disparate impact analysis, contending that use of the promotional exams, if they had been certified, would have had an adverse impact, and the plaintiffs, normally the "complaining party," arguing that the test results were sufficiently job-related to be defensible under the law.

*Ricci*, No. 04cv1109, at 22 (alteration in original) (internal citations omitted). Unlike the Court of Appeals, the District Court answered the exceptional, and difficult, questions presented, concluding that the City's expressed desire to comply with "the letter and the spirit of Title VII," *id.* at 22, constituted a non-pretextual reason for its action, *id.* at 39-40, and therefore no employment discrimination occurred. Under the District Court's rationale, it appears that any race-based employment decision undertaken to avoid a threatened or perceived Title VII lawsuit is immune from

11

scrutiny under Title VII.[6] This appears to be so, moreover, regardless of whether the employer has made any efforts to verify that a valid basis exists for the putative Title VII suit. Applying this rationale, the District Court concluded that the City, which had not conducted any study to determine whether latent racial bias had tainted the results of the promotion examination, could discard the results of the examination, *id.* at 25-26, in the hope that a future test would yield a preferable racial distribution, *id.* at 36. Regardless of how one may decide the matter, there can be little doubt that a decision of this Court thus sanctioning race-based employment decisions in the name of compliance with Title VII raises novel questions that are indisputably of "exceptional importance."

## CONCLUSION

It is arguable that when an appeal raising novel questions of constitutional and statutory law is resolved by an opinion that tersely adopts the reasoning of a lower court—and does so without further legal analysis or even a full statement of the questions raised on appeal—those questions are insulated from further judicial review. It is arguable also that the decision of this Court to deny *en banc* review of this appeal supports that view. What is not arguable, however, is the fact that this Court has failed to grapple with the questions of exceptional importance raised in this appeal. If the *Ricci* plaintiffs are to obtain such an opinion from a reviewing court, they must now look to the Supreme Court. Their claims are worthy of that review.

---

[6] Despite Judge Parker's assertion to the contrary, I do not charge the District Court with applying a "rubber stamp" to the City's race-based decisions. I simply question whether the Court of Appeals has set forth a standard for determining when such action is acceptable and when it violates the constitutional and statutory rights of citizens. If any fault is to be levied in this regard, it falls on our Court for failing to provide guidance, and not on the District Court which endeavored to confront this question of exceptional importance.

# Appendix A

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

### SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO SUMMARY ORDERS FILED AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY THIS COURT'S LOCAL RULE 32.1 AND FEDERAL RULE OF APPELLATE PROCEDURE 32.1. IN A BRIEF OR OTHER PAPER IN WHICH A LITIGANT CITES A SUMMARY ORDER, IN EACH PARAGRAPH IN WHICH A CITATION APPEARS, AT LEAST ONE CITATION MUST EITHER BE TO THE FEDERAL APPENDIX OR BE ACCOMPANIED BY THE NOTATION: "(SUMMARY ORDER)." A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF THAT SUMMARY ORDER TOGETHER WITH THE PAPER IN WHICH THE SUMMARY ORDER IS CITED ON ANY PARTY NOT REPRESENTED BY COUNSEL UNLESS THE SUMMARY ORDER IS AVAILABLE IN AN ELECTRONIC DATABASE WHICH IS PUBLICLY ACCESSIBLE WITHOUT PAYMENT OF FEE (SUCH AS THE DATABASE AVAILABLE AT HTTP://WWW.CA2.USCOURTS.GOV/). IF NO COPY IS SERVED BY REASON OF THE AVAILABILITY OF THE ORDER ON SUCH A DATABASE, THE CITATION MUST INCLUDE REFERENCE TO THAT DATABASE AND THE DOCKET NUMBER OF THE CASE IN WHICH THE ORDER WAS ENTERED.

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 15th day of February, two thousand and eight.

Present:     ROSEMARY S. POOLER,
             ROBERT D. SACK,
             SONIA SOTOMAYOR,
                  Circuit Judges,

_____

FRANK RICCI, MICHAEL BLATCHLEY, GREG BOIVIN, GARY CARBONE, MICHAEL CHRISTOFORO, RYAN DIVITO, STEVEN DURAND, WILLIAM GAMBARDELLA, BRIAN JOOSS, JAMES KOTTAGE, MATTHEW MARCARELLI, THOMAS J. MICHAELS, SEAN PATTON, CHRISTOPHER PARKER, EDWARD RIORDAN, KEVIN ROXBEE, TIMOTHY SCANLON, BENJAMIN VARGAS, JOHN VENDETTO AND MARK VENDETTO,

                         Plaintiffs-Appellants,

               -v-                                    (06-4996-cv)

JOHN DESTEFANO, KAREN DUBOIS-WALTON, THOMAS UDE JR., TINA BURGETT, BOISE KIMBER, MALCOM WEBER, ZELMA TIRADO AND CITY OF NEW HAVEN,

                         Defendants-Appellees.
_____

Appearing for Plaintiffs-Appellants:     Karen Lee Torre, New Haven, CT.

Appearing for Defendants-Appellants:     Richard A. Roberts (Nicole C. Chomiak, Stacey L. Pitcher, and Todd J. Richardson on the brief), Cheshire, CT.

**UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Plaintiffs appeal from a judgment of the United States District Court for the District of Connecticut (Arterton, J.) granting the defendants' motion for summary judgment on all counts.

We affirm, substantially for the reasons stated in the thorough, thoughtful, and well-reasoned opinion of the court below. In this case, the Civil Service Board found itself in the unfortunate position of having no good alternatives. We are not unsympathetic to the plaintiffs' expression of frustration. Mr. Ricci, for example, who is dyslexic, made intensive efforts that appear to have resulted in his scoring highly on one of the exams, only to have it invalidated. But it simply does not follow that he has a viable Title VII claim. To the contrary, because the Board, in refusing to validate the exams, was simply trying to fulfill its obligations under Title VII when confronted with test results that had a disproportionate racial impact, its actions were protected.

The judgment of the district court is AFFIRMED.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

By:_____

2

# Appendix B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FRANK RICCI, et al.,            :
     Plaintiffs,               :
                               :
v.                             :      Civil No. 3:04cv1109 (JBA)
                               :
JOHN DESTEFANO, et al.,        :
     Defendants.               :


**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**
**[DOCS. ## 52, 60]**

In March 2004 the New Haven Civil Service Board ("CSB") refused to certify the results of two promotional exams for the positions of Lieutenant and Captain in the New Haven Fire Department. This lawsuit arises from the circumstances leading to that decision and its consequences.

Plaintiffs are seventeen white candidates and one Hispanic candidate who took the promotional exams, on which they fared very well, but received no promotion because without the CSB's certification of the test results, the promotional process could not proceed. Defendants are the City of New Haven, Mayor John DeStefano, Chief Administrative Officer Karen Dubois-Walton, Corporation Counsel Thomas Ude, Director of Personnel Tina Burgett, and the two members of the CSB, Malcolm Weber and Zelma Tirado, who voted against certification. Plaintiffs assert that defendants' actions in voting or arguing against certification of the examination results violated their rights under Title VII of

1

the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Equal Protection Clause, the First Amendment, and 42 U.S.C. § 1985; plaintiffs also allege a common law claim of intentional infliction of emotional distress. The parties have cross-moved for summary judgment on the Title VII and Equal Protection claims, and defendants additionally move for summary judgment on plaintiffs' other claims.

For the reasons that follow, defendants' motion for summary judgment [Doc. # 52] will be granted as to plaintiffs' federal claims; plaintiffs' cross-motion for summary judgment [Doc. # 60] will be denied; and the Court will decline jurisdiction over plaintiffs' state law claim.[1]

## I.    Factual Background

While the parties strenuously dispute the relevance and legal import of, and inferences to be drawn from, many aspects of this case, the underlying facts are largely undisputed. In November and December 2003, the New Haven Fire Department administered written and oral examinations for promotion to Lieutenant and Captain. The City's Department of Human Resources issued a Request for Proposal for these examinations, as a result of which I/O Solutions ("IOS"), a seven-year-old Illinois company that specializes in entry-level and promotional examinations for

---

[1]Defendants also moved to strike portions of plaintiffs' Local Rule 56(a)2 Statement, which motion was denied. See Ruling Denying Motion to Strike [Doc. # 130].

2

public safety (police and fire) departments, designed the examinations. Pl. Ex. IV(C) at 8. Under the contract between the City and the New Haven firefighters' union, the written exam result counted for 60% of an applicant's score and the oral exam for 40%. Those with a total score above 70% on the exam would pass.

Forty-one applicants took the Captain exam, of whom 25 were white, 8 black, and 8 Hispanic. Twenty-two of those applicants passed, of whom 16 were white, 3 black, and 3 Hispanic. Pl. Ex. Vol. I, at 43. Given that there were 7 Captain vacancies in the department when the tests were administered, and that the "Rule of Three" in the City Charter mandates that a civil service position be filled from among the three individuals with the highest scores on the exam, it appeared at that time that no blacks and at most two Hispanics would be eligible for promotion, as the top 9 scorers included 7 whites and 2 Hispanics.[2]

Seventy-seven applicants took the Lieutenant exam, of whom 43 were white, 19 black, and 15 Hispanic. Thirty-four passed, of whom 25 were white, 6 black and 3 Hispanic. Id. There were 8 vacancies, but because all of the top 10 scorers were white, it appeared that no blacks or Hispanics would be promoted.[3]

---

[2]Hispanics ranked 7, 8 and 13; blacks ranked 16, 19 and 22. Pl. Ex. Vol. I, at 43.

[3]Hispanics ranked 27, 28 and 31; blacks ranked 14, 15, 16, 20, 22, and 24. Pl. Ex. Vol. I, 43.

3

Certified promotional lists remain valid for two years.

The CSB held five hearings between January and March 2004 on the issue of whether to certify the test results. The issue appears to have been raised by New Haven's Corporation Counsel, Thomas Ude. At the initial hearing on January 22, 2004, Mr. Ude characterized the exam results as "a very significant disparate impact . . . that caused us to think this was something we should bring to you, the Civil Service Board, to evaluate and to be part of and to ultimately make a decision about the process." Pl. Ex. Vol. IV(A) at 32. While it is disputed whether Mr. Ude already had made up his mind to advise the CSB against certifying the results, his comments "emphasize[d] . . . that the case law does not require that the City find that the test is indefensible in order to take action that it believes is appropriate to remedy . . . disparate impact from examination." Id. at 34-35. He advised that "federal law does not require that you [the CSB] make a finding that this test . . . was not job-related, which is another way of saying it wasn't fair. A test can be job-related and have a disparate impact on an ethnic group and still be rejected because there are less discriminatory alternatives for the selection process." Id. at 36.

During the hearings, the tests results were not released by name, and therefore none of the firefighters knew where they had placed. The only information provided to the CSB and the public,

4

including plaintiffs, was the scores by race and gender. Nonetheless, several firefighters, although they did not know where they had placed, spoke in favor of certifying the results. Plaintiff Frank Ricci stated that the questions on the test were drawn from "nationally recognized" books and New Haven's own Rules and Regulations and Standard Operating Procedures. Pl. Ex. Vol. IV(A) at 88. He stated that he "studied 8 to 13 hours a day to prepare for this test and incurred over $1,000 in funds [sic] to study for this test," including purchasing the books and paying an acquaintance to read them on tape because he is dyslexic and learns better by listening. Other firefighters, who believed the tests were fair, also spoke in support of the certifying the results. See, e.g., Testimony of Michael Blatchley, id. at 75 ("[N]one of those questions were not in that study material. Every one of those questions came from the material.").

During the first hearing, the CSB also took statements from several New Haven firefighters who complained that some of the questions were not relevant to knowledge or skills necessary for the positions (see, e.g., Statement of James Watson, id. at 85 ("I think this test was unfair. We don't use a lot of things that were on that test" such as whether to park a firetruck facing "uptown" or "downtown")), or that the study materials were difficult to obtain (see Testimony of Gary Kinney, id. at 77

5

("The only books that most of us had in front of us in the fire houses were Essentials of Fire Fighting. . . . [T]hese books [on the syllabus] were never in the fire houses.")).

At the second hearing on February 5, Patrick Egan, president of the firefighters' union, urged the CSB to conduct a validation study to determine the job-relatedness of the test, referring generally, although not by name, to the EEOC's "Uniform Guidelines of Employee Selection Procedures." Pl. Ex. Vol. IV(B) at 11-12. Plaintiffs' counsel in the present case also spoke and urged certification.

On the other side, Donald Day, a representative of the Northeast Region of the International Association of Black Professional Firefighters, argued against certification, stating that previous promotional examinations in 1996 and 1999 had black and Latino firefighters ranked sufficiently high to have a realistic opportunity for promotion, whereas "there was something inherently wrong with this test" because minorities did not score as highly. Id. at 33-34. He suggested that the CSB speak with the director of the civil service in Bridgeport "to find out what Bridgeport is doing different [sic] than New Haven," as they have more diversity in their firefighter ranks. Id. at 35. In particular, he stated that Bridgeport had "changed the relative weights" among the portions of the exam, such that the written test counts for 30% of the total score, the oral test for 65%,

6

and seniority 5%. Id. at 36-37. Ronald Mackey, the Internal Affairs Officer for the Northeast Region of the International Association of Black Professional Firefighters, supported Patrick Egan's suggestion of obtaining a validation study, and also suggested that New Haven could "adjust the test" as Bridgeport had done, in order to "meet the criteria of having a certain amount of minorities get elevated to the rank of Lieutenant and Captain." Id. at 43-45.

On February 11, 2004, the CSB heard from Chad Legel, Vice President of IOS, who was the "project manager" in charge of developing the exams at issue. He stated that IOS had prepared "both an entry-level exam and a physical ability test for the firefighter position" in New Haven, but had not previously prepared a New Haven promotional exam. Id. at 10. However, in recent years his company had worked with similarly-sized public safety departments with demographics similar to New Haven, including Lansing, Michigan, Orange County, Florida, and the North Miami Police Department, among others. Id. at 9.

Legel described the way in which the test was developed. First, the company interviewed a random sample of current New Haven Fire Department Lieutenants, Captains and Battalion Chiefs to determine basic information concerning the structure of the department, the tasks required of individuals at each rank, and the materials the department generally utilizes for training.

7

Based on the interviews, IOS developed a written job analysis questionnaire ("JAQ") that asked all incumbents in the positions of Lieutenant and Captain "to provide information about how important they feel a specific task, knowledge area, skill or ability is. . . ." Id. at 17. The JAQ asked how important each task was to successful performance on the job and how frequently it was necessary to perform it. Importance and frequency were merged into a metric called "criticality or essentiality." Id. at 19. Tasks above a certain criticality threshold were designated for testing on the written and oral portions of the exam. In response to the question of whether he has generally found a difference between information tested in various departments "based on the racial content of the city and the force," Legel stated, "definitely no." Id. at 21. The one difference among the New Haven firefighters of similar rank that Legel noted was different levels of training in certain specialized fields such as hazardous materials; such variation "throws up a red flag" indicating that IOS should not ask "high-level questions about hazardous materials. . . ." Id. at 22.

Legal further stated that all the questions were firmly rooted in the study materials on the syllabus, which was distributed with the promotion applications. See Def. Ex. 16 ("Written Examination Reference List"). Once the test was completed, an "independent reviewer," a Battalion Chief from the

8

Cobb County, Georgia, Fire Department, "reviewed the written exam for content and fidelity to the source material." Pl. Ex. Vol. IV(B) at 24-25. Another independent reviewer, a retired Fire Chief from outside Connecticut, reviewed the oral exam questions. Id. at 26. IOS refrained from utilizing reviewers from Connecticut because the RFP had specified that examiners must come from outside Connecticut, due to concerns that utilizing internal personnel could potentially facilitate cheating on the test.

Likewise, IOS selected the panelists for the oral examination panels from departments outside Connecticut, making an effort "to gain maximum diversity." Id. at 32. All but one panel had one African-American, one Hispanic and one white assessor, and a standby panel had two African-Americans and one white. Id. The assessors were trained on how to grade the oral exam scenarios consistently, utilizing checklists of desired criteria. Each panelist also held at least an equal rank (if not superior) to the position being tested, in order to be able to identify an answer that was good but not quite the best answer outlined in the checklist. Id. at 33-34, 37.

Legel concluded by "implor[ing] anyone that had . . . concerns [about disparate impact] to review the content of the exam. In my professional opinion, it's facially neutral." Id. at 49.

Noelia Marcano, Chief Examiner for the City of New Haven and Secretary to the CSB, explained the process by which the RFP was developed and IOS chosen. She further explained that the job applications for the Lieutenant and Captain positions contained a job description, employment application, and "the actual study list in final form," and that when questions arose concerning conflicting information in some of the study books, IOS sent a letter to all applicants that they would not be asked questions on material where the sources differed. Id. at 78.

At the next hearing on March 11, 2004, the CSB heard from Christopher Hornick, Ph.D., an industrial/organizational psychologist from Texas who runs a consulting business in competition with IOS.[4] See Pl. Ex. Vol. IV(D) at 7, 12. Dr. Hornick stated that he had "not had time to study the test at length or in detail." Id. at 13. However, he reviewed statistics provided by the City and concluded that "we're seeing relatively high adverse impact" from the IOS tests. Id. at 11. He opined that his company finds "significantly and dramatically less adverse impact in most of the test procedures that we

[4]Plaintiffs argue that Dr. Hornick's non-sworn, hearsay statement at the CSB hearing is inadmissible as non-disclosed expert evidence. Plaintiffs' argument is rejected because defendants proffer Dr. Hornick's not for the truth of his conclusion that the tests had a racially disparate impact, but to show that defendants had a good faith belief, based in part on Dr. Hornick's testimony, that such a disparate impact existed and justified the decision not to certify the exams.

10

design." <u>Id.</u> at 12.  He stated:

> Normally, whites outperform ethnic minorities on the majority of standardized testing procedures.  That is, in fact, the case with the data that we've seen in New Haven.
>
> I'm a little surprised at how much adverse impact there is in these tests.  And I hope at some point here we'll be talking in detail about that.  But my conclusion is that we did have significant adverse impact.  Some of it is fairly typical of what we've seen in other areas of the countries (sic) and other tests that people have developed.  But in other ways it is somewhat worse than what we're typically seeing in the profession practiced by others.

<u>Id.</u> at 11-12.  Dr. Hornick acknowledged that he had not looked at specific statistics from previous promotional examinations in New Haven to compare their results with the 2003 exam results.  <u>Id.</u> at 14.

When asked about the reasons behind any possible disparate impact, Dr. Hornick answered, "I'm not sure that I can explain it," but suggested that perhaps the 60%/40% breakdown mandated by the collective bargaining agreement could be responsible, and further suggested that there were "perhaps different types of testing procedures that are much more valid in terms of identifying the best potential supervisors in your fire department."  <u>Id.</u> at 15.  He stated that based on his interviews with firefighters, "we know that" a written test is "not as valid as other procedures that exist."  <u>Id.</u> at 16.  He also suggested that "[b]y not having anyone from within the department review the items [on the test] you inevitably get things in there" that

11

are not relevant to the specific department. Id. at 17-18. Finally, Dr. Hornick identified as an alternative to traditional written and oral testing processes "an assessment center process, which is essentially an opportunity for candidates to demonstrate their knowledge of the . . . standard operating procedures, to demonstrate how they would address a particular problem as opposed to just verbally saying it or identifying the correct option on a written test. For example, there's concepts of situation judgment tests that can be developed and designed, customized within organizations that demonstrate dramatically less adverse impacts. . . ." Id. at 22-23.

At the same hearing, Vincent M. Lewis, a Fire Program Specialist for the U.S. Department of Homeland Security, and a retired career firefighter from Michigan, testified that he believed the test was appropriate. He stated that he had looked "extensively at the Lieutenant's exam and a little less at the Captain's exam," and believed that the candidates "should know that material." Id. at 34-35. His one comment was that "a number of questions in the Lieutenant's exam dealt with issues that an apparatus driver needed to know," and a candidate who had not had such training would be disadvantaged on those questions. Id. at 34, 41. However, he generally "felt the questions were relevant for both exams," and believed that the New Haven applicants were advantaged over examinees in other locations

12

because they were instructed exactly which chapters from the study materials would be on the tests. Id. at 36. He stated that he would not have changed anything about the way in which the tests were developed, and opined that any disparate impact could be due to a general pattern that "usually whites outperform some of the minorities on testing," or that "more whites . . . take the exam." Id. at 37-38.

The last expert witness was Dr. Janet Helms, a professor of counseling psychology and the Director of the Institute for the Study and Promotion of Race and Culture at Boston College. Her area of expertise "is not with firefighters per se but is more in the general area of how race and culture influence test performance more generally." Id. at 43. She did not examine the specific tests at issue. Id. at 55. However, she offered several potential explanations for racially disparate impact on the tests. First, "[w]e know for a fact that regardless of what kind of written test we give in this country that we can just about predict how many people will pass who are members of under-represented groups. And your data are not that inconsistent with what predictions would say were the case." Id. at 44 (emphasis supplied). Second, Dr. Helms suggested that because 67% of the respondents in the JAQ survey were white, the questions may have been skewed toward their job knowledge, as "most of the literature on firefighters show that the different

13

[racial and gender] groups perform the job differently." Id. at 46. Relying on information she had read in newspaper accounts of the situation in New Haven, she stated that the difference in performance may have been due to differences in opportunities for training and "informal mentoring" available to minorities. Id. at 48. With respect to the oral exam, Dr. Helms suggested that people who are bilingual or "speak accented speech" may elicit more negative reactions from evaluators. Id. at 49-50. As general concerns, Dr. Helms mentioned that test takers may score lower if they are expected not to perform well, or if tests focus on "traditional ways of doing the job and the test-taker, in fact, uses innovative approaches." Id. at 51. Additionally, she suggested that "removing" "socioeconomic status" from test scores "reduces the disparate impact to some extent." Id. at 57.

At the final hearing on March 18, 2004, defendant Ude, the Corporation Counsel, strongly advocated against certifying the exam results. He concluded: "You have a choice. It is my opinion that promotions under our rules as a result of these tests would not be consistent with federal law, would not be consistent with the purposes of our Civil Service Rules or our Charter, nor is it in the best interests of the firefighters and Lieutenants who took the exams." Pl. Ex. Vol. IV(E) at 15-16. As a primary reason not to certify the results, Ude argued that the "results of previous exams in this department and in other

14

departments have not had this kind of a result, which is one of the reasons why these results were so startling when they came down. These results were different." Id. at 19. He argued that Dr. Hornick's statements to the CSB, standing alone, were "sufficient" reason not to certify, and advised the board "that it is the employer's burden to justify the use of the examination" if a Title VII suit were brought. Id. at 21.

Defendant Walton spoke "on behalf of the Mayor" and also advocated discarding the test results, primarily because the eligibility list, when combined with the Rule of Three and the number of vacancies then available, would "create a situation in which African-Americans are excluded from promotional opportunity on both the Captain and Lieutenant positions and Latinos are excluded from promotional opportunity on the Lieutenant examination." Id. at 30. She questioned whether there were "other ways of making the selection," that would be less "discriminatory." Id. at 31-32.

The board split two to two[5] on the question of certifying each exam, see id. at 70-73, as a result of which the promotional lists were not certified.

Plaintiffs allege that the non-certification vote was due to

_____

[5]The fifth member of the CSB, Barbara Tinney Jennings, was recused because her brother, Lt. Gary Tinney, was a candidate for promotion on the Captain's examination. She did not attend the hearings concerning these promotional exams.

political pressure, particularly by defendant Rev. Boise Kimber, a vocal African-American minister who, it is acknowledged by all parties, is a political supporter and vote-getter for Mayor DeStefano. Plaintiffs' theory is that the defendants urged the CSB not to certify the results in the interest of pleasing minority voters and other constituents in New Haven whose priority was increasing racial diversity in the ranks of the Fire Department. Plaintiffs further argue that this pattern of political manipulation is in keeping with prior actions by the City of New Haven disregarding the Charter-mandated Rule of Three in promotional decisions in the City's police and fire departments. In support of this argument, plaintiffs proffer evidence regarding prior litigation in the Connecticut Superior and Appellate Court, the substance and outcome of which is largely admitted by defendants,[6] and which resulted in sharp rebukes against the City for violating the civil service rules. See Pl. L.R. 56(a)1 Stmt. ¶¶ 64-90; Def. Am. L.R. 56(a)2 Stmt. ¶¶ 64-90. Plaintiffs argue that the apparent racial disparity in the results of the Lieutenant and Captain exams was due to the fact that hiring into, and promotion within, the Fire Department historically has been based on political patronage and promotion

---

[6]Defendants challenge the relevance of this evidence; however, as the Court held in its ruling on defendants' motion to strike, such evidence is relevant as background information to the present case.

16

of racial diversity rather than merit; and they argue that the higher-scoring firefighters simply studied harder. In addition, they argue that the evident disparity was not appreciably worse on the 2003 examinations than other past promotional examinations.

Defendants argue that "the decision not to certify [the test] results was mandated by anti-discrimination federal, state and local laws." Def. Mem. in Support of Mot. for Summary Judgment [Doc. # 52] at 4. Alternatively, they argue that they had a good faith belief that Title VII mandated non-certification of the examinations, and they cannot be liable under Title VII for attempting to comply with that very statute. Defendants additionally argue that plaintiffs lack standing to bring their Equal Protection claim, or, if they do have standing, the claim lacks merit because all firefighters were treated the same, regardless of race, as no one was promoted as a result of the contested exams.

Plaintiffs counter that a "good faith belief" that certifying the test results would violate Title VII does not constitute a defense, as a matter of law, to an allegation of Title VII or Equal Protection violations against the plaintiffs.

## II. Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is

17

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 966 F.2d 1455, 1461 (2d Cir. 1993) (citing Schwabenbauer v. Board of Educ. of Olean, 667 F.2d 305, 313 (2d Cir. 1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Schwabembauer, 667 F.2d at 314.

## III. Discussion

### A. Title VII

Plaintiffs argue that defendants' decision and/or advocacy against certifying the exam results amounted to intentional discrimination against plaintiffs, 17 of whom are white and one of whom is Hispanic, in favor of Hispanic and African-American

18

examinees who were favored due to their race and their alleged political support of Mayor DeStefano, via the Rev. Boise Kimber. Plaintiffs essentially argue that defendants' professed desire to comply with Title VII's anti-disparate-impact requirements was in fact a pretext for intentional discrimination against white candidates. Because plaintiffs allege intentional discrimination, the familiar McDonnell Douglas three-prong burden-shifting test applies.

### 1. Burden-Shifting Framework

Under that framework, plaintiffs first must establish a prima facie case of discrimination on account of race. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). To do so, they must prove: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "A plaintiff's burden of establishing a prima facie case is de minimis." Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 467 (2d Cir. 2001). Defendants do not dispute the first three prongs of the test, but argue that plaintiffs cannot establish an inference of discrimination because all applicants were treated the same, as nobody was promoted off the examination

19

lists.

Proof of a prima facie case shifts the burden to defendant "to produce evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal citations, quotations, and alterations omitted). Defendant's burden is satisfied if the proffered evidence "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). In this case, defendants proffer a good faith attempt to comply with Title VII as their legitimate nondiscriminatory reason for refusing to certify the exams.

If the employer articulates a neutral reason for the plaintiff's termination, the burden shifts back to the plaintiff to show pretext. That is, the plaintiff "may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143.

### 2. Prima Facie Case

Plaintiffs' evidence - and defendants' own arguments - show that the City's reasons for advocating non-certification were

20

related to the racial distribution of the results.  As the transcripts show, a number of witnesses at the CSB hearings, including Kimber, mentioned "diversity" as a compelling goal of the promotional process.  Ude, Marcano, and Burgett specifically urged the CSB not to certify the results because, given the number of vacancies at that time, no African-Americans would be eligible for promotion to either Lieutenant or Captain, and no Latinos would be eligible for promotion to Captain.  They believed this to be an undesirable outcome that could subject the City to Title VII litigation by minority firefighters, and the City's leadership to political consequences.  Had the tests not yielded what defendants perceived as racially disparate results, defendants would not have advocated rejecting the tests, and plaintiffs would have had an opportunity to be promoted.

A jury could infer that the defendants were motivated by a concern that too many whites and not enough minorities would be promoted were the lists to be certified.  Given their minimal prima facie burden, the Court will assume arquendo that plaintiffs have proffered sufficient evidence to satisfy the fourth prong of the prima facie case, given defendants' acknowledgment that racial concerns, i.e. the disparate impact of the test results on minority firefighters, provided the impetus for their actions.

### 3.  Pretext/Discriminatory Intent

Defendants proffer as their legitimate non-discriminatory reason that they desired to comply with the letter and the spirit of Title VII.  Plaintiffs deride this "feigned desire to 'comply' with Title VII," Pl. Mem. of Law [Doc. # 81] at 3, arguing that defendants in fact violated that statute, and their actions were a mere pretext for promoting the interests of African-American firefighters and political supporters of the mayor.

As plaintiffs point out, this case presents the opposite scenario of the usual challenge to an employment or promotional examination, as plaintiffs attack not the use of allegedly racially discriminatory exam results, but defendants' reason for their refusal to use the results.  See Pl. Mem. of Law at 32, 34-35.  Ordinarily, as contemplated by the statute, the "complaining party" bears the burden of proving a disparate impact, and the "respondent" bears the burden of "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity," or, alternatively, the "complaining party" may prevail by showing that an alternative employment practice with less disparate impact existed and that the respondent failed to utilize it.  See 42 U.S.C. § 2000e-2(k).  Here, the roles of the parties are in essence reversed, with the defendants, normally reflecting a "respondent" role in the Title VII disparate impact analysis, contending that use of the

22

promotional exams, if they had been certified, would have had an adverse impact, and the plaintiffs, normally the "complaining party," arguing that the test results were sufficiently job-related to be defensible under the law.

### a. Existence of Racially Disparate Impact

Although the parties dispute the exact racial breakdown of candidates passing the Captain's test,[7] plaintiffs do not dispute that the results showed a racially adverse impact on African-American candidates for both the Lieutenant and Captain positions, as judged by the EEOC Guidelines. Pl. L.R. 56 Stmt. ¶ 246; Def. L.R. 56 Stmt. ¶ 246. Thus, it is necessarily undisputed that, had minority firefighters challenged the results of the examinations, the City would have been in a position of defending tests that, under applicable Guidelines, presumptively had a disparate racial impact.

Specifically, the EEOC "four-fifths rule" provides that a selection tool that yields "[a] selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate

_____

[7]Plaintiffs assert that 32% of African-American examinees passed the Captain's examination, while defendants assert the figure is 37.5%. See Marcano Aff., Def. Ex. 4, ¶ 21; Pl. L.R. 56(a) Stmt. ¶¶ 244-47.

will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D).

Here, the evidence shows that on the 2003 Lieutenant's exam the pass rate for whites was 60.5%, for African-Americans 31.6% and Hispanics 20%. The four-fifths score would be 48%. In other words, African-Americans had a pass rate that was about half the pass rate for Caucasians, yielding an adverse impact ratio ("AIR") of 0.59, significantly below the AIR of 0.80 that is presumed to not evidence adverse impact under the EEOC Guidelines. See Pl. L.R. 56(a) Stmt. ¶ 246; Def. L.R. 56(a) Stmt. ¶ 246. While the parties dispute the Captain's exam pass rate for African-Americans and Hispanics (see supra note 7), the pass rate for Caucasians was 88%, which is more than double that of minorities and thus by either party's statistic an AIR far below the four-fifths guideline is yielded.

Plaintiffs argue that these AIRs were not appreciably different from those on past promotional exams, and therefore defendants' stated concern with avoiding adverse impact must be pretextual. The parties agree that the AIRs on the 1999 promotional examinations would have failed the four-fifths rule as well. The AIR for African-Americans on the 1999 Lieutenant's exam was 0.58, compared to 0.59 on the 2003 test. See Pl. L.R. 56(a) Stmt. ¶ 246; Def. L.R. 56(a) Stmt. ¶ 246. The 1999 Captain examination had an AIR of 0.45 on African-American test-takers.

24

See Pl. Ex. Vol. I, 40 (1999 scores).

However, it is also undisputed that, because of the Rule of Three, the pass rate is not synonymous with the promotion rate, because only the top three scorers may be considered for each vacant position. Thus, the rank of the minority applicants is also a key factor. In 2003, given the number of vacancies, it appeared that at most two Hispanics and no African-Americans would have the opportunity to be promoted to Captain, and no minorities would have the opportunity to be promoted to Lieutenant. Although the record lacks specification, witnesses at the CSB hearings testified to the effect that in 1999 more minority candidates had scored toward the top of the lists, and therefore had more promotional opportunities.

In any event, in 2003 defendants' concern was with the absence of minority candidates potentially eligible to be promoted, and with the diversity of the Fire Department's management in general. Thus, the fact that the 1999 exams also had a statistically adverse impact yet were certified, while the 2003 results were not, is insufficient in itself to show that defendants' concerns about complying with Title VII were pretextual.

### b. Validation Study and Less Discriminatory Alternatives

Plaintiffs additionally argue that defendants' decision was pretextual because they failed to complete a validation study to

25

test whether the 2003 exams could be defended as adequately job-related. Going further, plaintiffs argue that defendants were legally required to conduct such a validation study before rendering a decision on certification of the results.

Title VII provides: "Notwithstanding any other provision . . . it shall not be an unlawful employment practice for . . . an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(h). As plaintiffs concede, this section "provides that professionally developed and properly validated tests are a defense to a claim of disparate impact." Def. Mem. of Law at 32 (emphasis supplied). The statute itself does not require employers to implement or continue to use any test simply because it is professionally developed, nor does it provide a defense to an employer who "use[s]" a test with a discriminatory impact where other less-discriminatory, equally effective, alternatives are available. 42 U.S.C. § 2000e-2(h).

Although plaintiffs argue that EEOC guidelines mandated that defendants conduct a validation study before deciding not to certify the exams, the language of the guidelines does not support such a requirement. A validation study is a method for

26

determining whether a test is sufficiently related to the position for which the test or other criterion is administered. The EEOC's Uniform Guidelines for Employee Selection Procedures create a presumption that "[t]he use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines." 29 C.F.R. § 1607.3(A). The Guidelines further state:

> Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact. Accordingly, whenever a validity study is called for by these guidelines, the user should include, as a part of the validity study, an investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines.

Id. at § 1607.3(B).

> . . . Where a selection procedure results in an adverse impact on a race, sex, or ethnic group . . . and that group is a significant factor in the relevant labor market, the user generally should investigate the possible existence of unfairness for that group if it is technically feasible to do so. The greater the severity of the adverse impact on a group, the greater the need to investigate the possible existence of unfairness.

29 C.F.R. § 1607.14(B)(8)(b). The Guidelines provide technical

27

guidance for three types of studies: criterion-related validity studies, content validity studies, and construct validity studies. See generally 29 C.F.R. § 1607.14.

The Guidelines are written on the assumption that the employer would be defending a certain test and seeking to validate such test in response to a disparate impact challenge from protected group employees. They do not address the situation in the present case of an employer rejecting a test without conducting a validation study. Nonetheless, it is evident from the language of the guidelines that a validation study is contemplated as one method by which an employer can defend its use of a test or other selection method it desires to utilize by demonstration that it is sufficiently job-related to pass muster under the statute, despite a racially adverse impact. The guidelines do not require or mandate a validity study where an employer decides against using a certain selection procedure that manifests this impact and plaintiff's argument that defendants violated Title VII by refusing to conduct a validity study before rejecting testing results is thus unpersuasive.

Plaintiffs argue that the CSB did not have extensive evidence of the existence of other, less-discriminatory, and equally-effective selection measures. Dr. Hornick telephonically testified that other tests, particularly ones he had developed, generally yield less adverse impact, and mentioned that an

28

"assessment center approach" might benefit New Haven, without specifically explaining what that approach entailed. As plaintiffs argue, there was no testimony that an "assessment center" approach has a demonstrably less adverse impact, and there is some evidence in the record in this case, including from Dr. Hornick's website, that such an approach may still have some adverse impact. Dr. Hornick acknowledged that he had not had time to review the exams carefully, and his comments illustrated lack of familiarity with the methods IOS utilized to develop the tests. He suggested that lack of internal review by members of the New Haven Fire Department could have yielded questions that were less relevant to the particular department, but offered no explanation of why such a circumstance would have an adverse impact on minority candidates in particular. Dr. Helms from Boston College testified that the racial disparity on the exams at issue were not significantly different from the statistical disparities apparent on standardized tests nationwide. Mr. Lewis, the arson specialist from the Department of Homeland Security, stated that he believed the tests were fair and focused on material that a Lieutenant or Captain should know.

On the other hand, Dr. Hornick and representatives of the black firefighters' union suggested that the 60/40 weighting system for the oral and written examinations could have produced an adverse impact. The testimony suggested that changing the

29

weighting system yielded increased minority pass rates and diversity in the ranks of Bridgeport firefighters and officers. Dr. Helms suggested that because different employees have different ways of doing the same job, the fact that approximately 2/3 of those interviewed for the JAQ were white could have unintentionally introduced a bias into the test instrument. She and Mr. Lewis also suggested that differences in the availability of formal training and informal mentoring may have created the disparate effect apparent in the results.

Plaintiffs purport to counter this argument with affidavits emphasizing how much they studied and sacrificed to perform well on the exams, compared to their observations of the efforts of some other examinees, and point to the availability of study groups and informal mentoring in the department.

It appears that the reasons for testing disparities remain elusive. Dr. Helms testified that many theories exist, but experts on standardized testing nationwide have been unable to satisfactorily fully explain the reasons for the disparity in performance observed on many tests.

Plaintiffs' argument boils down to the assertion that if defendants cannot prove that the disparities on the Lieutenant and Captain exams were due to a particular flaw inherent in those exams, then they should have certified the results because there was no other alternative in place. Notwithstanding the

30

shortcomings in the evidence on existing, effective alternatives, it is not the case that defendants <u>must</u> certify a test where they cannot pinpoint its deficiency explaining its disparate impact under the four-fifths rule simply because they have not yet formulated a better selection method.

### c. Diversity Rationale

The real crux of plaintiffs' argument is that defendants refused to explore alternatives or conduct a validity study because they had already decided that they did not like the inevitable promotional results if the process continued to its expected conclusion,[8] and that their "diversity" rationale is prohibited as reverse discrimination under Title VII.

In <u>Hayden v. County of Nassau</u>, 180 F.3d 42 (2d Cir. 1999), the Second Circuit held that race-conscious configuration of an entry-level police department exam did not violate Title VII or the Equal Protection Clause. In that case, the Nassau County Police Department was operating under several consent decrees prohibiting it from engaging in discrimination in its selection of police officers, and particularly from utilizing examinations with disparate impact on minority applicants. Following development of a test by the county and Department of Justice

---

[8]Plaintiffs present evidence in the form of emails from the Mayor's staff suggesting they desired to convince the CSB not to certify, and further suggesting that if the CSB had certified, the Mayor would have announced his intention to refuse to forward the lists to the Fire Department for promotion.

31

advisors, a validity analysis was conducted to determine which configuration of the test was sufficiently job-related "yet minimized the adverse impact on minority applicants. Of the twenty-five sections administered to the applicants, the [technical report] recommended that Nassau County use nine sections as the . . . test." Id. at 47. A class of White and Latino officers challenged use of the adjusted test under Title VII and the Fourteenth Amendment, inter alia, contending that the deliberate design of the test to reduce adverse impact on African-American candidates necessarily discriminated against them on the basis of race. The Court of Appeals rejected the plaintiffs' contentions, finding plaintiffs were "mistaken in treating racial motive as a synonym for a constitutional violation" and observing that "[e]very antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race. That does not make such enactments or actions unlawful or automatically suspect . . ." Id. at 48-49 (quoting Raso v. Lago, 135 F.3d 11, 16 (1st Cir.)) (internal quotation marks omitted). The Hayden court further held that the construction of the Nassau County test for the purpose of minimizing adverse impact on minorities was not intentional "reverse discrimination" against whites because the same nine test sections were used for all applicants, so it was "simply not analogous to a quota system or

a minority set-aside where candidates, on the basis of their race, are not treated uniformly." Id. at 50. Rejecting plaintiffs' argument that the design of the test reflected impermissible discriminatory intent, the Second Circuit wrote that "nothing in our jurisprudence precludes the use of race-neutral means to improve racial and gender representation. . . . [T]he intent to remedy the disparate impact of the prior exams is not equivalent to an intent to discriminate against non-minority applicants." Id. at 51.

In Kirkland v. New York State Department of Correctional Services, 771 F.2d 1117 (2d Cir. 1983), the Court of Appeals affirmed the district court's approval of a settlement that determined promotional order based partly on exam results and partly on race-normed adjustments to the exam, after minority employees made a prima facie showing that the test had an adverse impact on minorities. The Court of Appeals noted that "voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination," id. at 1128, and that requiring a full hearing on the test's job-validity before approving a settlement "would seriously undermine Title VII's preference for voluntary compliance and is not warranted," id. at 1130. Thus, "a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious

33

claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies." Id. at 1130.

The Second Circuit expanded Kirkland in Bushey v. New York State Civil Service Commission, 733 F.2d 220 (2d Cir. 1984). There, the civil service commission had administered a promotional examination that had a significant adverse impact, with non-minority applicants passing at almost twice the rate of minority applicants. The defendants race-normed the scores for each group, increasing the pass rate of the minority group to the equivalent of the non-minority group, and effectively making an additional 8 minority individuals eligible for promotion, without taking any non-minorities off the list. The Court of Appeals held that the initial results, particularly "the score distributions of minority and nonminority candidates, were sufficient to establish a prima facie showing of adverse impact," id. at 225, and, consistent with Kirkland, "a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportional racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for employer-initiated, voluntary race-conscious remedies," id. at 228. In other words, a prima facie case is one way that a race-conscious remedy is justified, but it is not required: all that is required is "a sufficiently serious claim of discrimination" to warrant such a remedy. Id. at 228; see

34

also id. at 226 n. 7.

In this case, the parties agree that the adverse impact ratios for African-American and Hispanic test-takers on both the Lieutenant and Captain exams were too low to pass muster under the EEOC's "four-fifths rule." As Kirkland and Bushey held, a statistical showing of discrimination, and particularly a pass rate below the "four-fifths rule," is sufficient to make out a prima facie case of discrimination, and therefore sufficient to justify voluntary race-conscious remedies.[9] Here, defendants' remedy is "race conscious" at most because their actions reflected their intent not to implement a promotional process based on testing results that had an adverse impact on African-Americans and Hispanics. The remedy chosen here was decidedly less "race conscious" than the remedies in Kirkland and Bushey,

---

[9]Plaintiffs denigrate reliance on Kirkland and Bushey on the grounds that the "race-norming" procedures utilized in those cases would be unlawful under the 1991 amendments to the Civil Rights Act. See 42 U.S.C. § 2000e-2(l) ("It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin."). See also Hayden, 180 F.3d at 53 (this provision was "intended to prohibit 'race norming' and other methods of using different cut-offs for different races or altering scores based on race.") (emphasis in original). While plaintiffs are correct that Title VII now prohibits race-norming, none is alleged to have happened here and the 1991 amendments do not affect the reasoning and holding of either case, namely, that a showing of a "sufficiently serious claim of discrimination" is adequate to justify race conscious, remedial measures.

35

because New Haven did not race-norm the scores, they simply decided to start over, to develop some new assessment mechanism with less disparate impact. Thus, while the evidence shows that race was taken into account in the decision not to certify the test results, the result was race-neutral: all the test results were discarded, no one was promoted, and firefighters of every race will have to participate in another selection process to be considered for promotion. Indeed, there is a total absence of any evidence of discriminatory animus towards plaintiffs – under the reasoning of Hayden, 180 F.3d at 51, "nothing in our jurisprudence precludes the use of race-neutral means to improve racial and gender representation. . . . [T]he intent to remedy the disparate impact of the prior exams is not equivalent to an intent to discriminate against non-minority applicants."[10]

---

[10]Taxman v. Bd. of Educ. of T'wp of Piscataway, 91 F.3d 1547, 1558 (3d Cir. 1996) (en banc), cert. dismissed, 522 U.S. 1010 (1997), relied on by plaintiffs, is readily distinguishable. There, the board of education relied on an affirmative action plan to defend its decision to lay off a white teacher instead of a black teacher with equal seniority, and the Third Circuit held that promoting racial diversity on the faculty, absent a history of past discrimination, was insufficient justification for laying off the white teacher because of her race and violated Title VII. Here, defendants had ample statistical evidence that the tests had an adverse impact on minority candidates and importantly did not opt to select black applicants over white applicants for promotion, but rather decided to select nobody at all. Williams v. Consol. City of Jacksonville, No. 00cv469, 2002 U.S. Dist. LEXIS 27066 (D. Fla. July 5, 2002), can similarly be distinguished as that case did not concern a decision not to certify test results, but rather a post-certification decision not to create the positions which would result in plaintiffs' promotions because plaintiffs were not African-American.

36

Plaintiffs contend that Hayden is distinguishable by the fact that the remedy approved there was pursuant to previous consent decrees; they do not explain why they view this distinction as significant. As Bushey held, it would contravene the remedial purpose of Title VII if an employer were required to await a lawsuit before voluntarily implementing measures with less discriminatory impact. Bushey, 733 F.2d at 227 (rejecting the plaintiffs' argument that the remedial measures in Kirkland were only permissible as part of a settlement in that case, because that "would create an anomalous situation. It would require an employer . . . to issue a presumptively discriminatory eligibility list, wait to be sued by minority candidates, and only then seek a settlement.... Such an approach would serve no purpose other than to impede the process of voluntary compliance with Title VII and cause the proliferation of litigation in all such cases. . . .").

Plaintiffs also attempt to distinguish Hayden on the grounds that the challengers to that test, which was constructed from the nine most job-related sections with the least disparate impact, were not injured or disadvantaged, whereas "the instant plaintiffs have been both injured, as they were deprived of promotions, and disadvantaged as they will now be forced to compete once again." Pl. Mem. of Law at 58. Plaintiffs take this language from Hayden out of context. In holding that the

37

Hayden plaintiffs did not prove disparate impact on nonminority applicants, the Court of Appeals held that because "appellants continued to score higher than black candidates, on average, the exam did not impair or disadvantage these appellants in favor of African-American applicants. Thus, appellants are unable to set forth a claim that they endured any disparate impact as a result of the design and administration of the . . . examination." Hayden, 180 F.3d at 52. Here, plaintiffs allege disparate treatment, not disparate impact. Nor do they have a viable claim of disparate impact because the decision to disregard the test results affected all applicants equally, regardless of race – all applicants will have to participate in a new test or selection procedure.[11]

Furthermore, plaintiffs were not "deprived of promotions." As the parties agree, under New Haven's civil service rules, no applicant is entitled to promotion unless and until the CSB certifies the results. Even then, application of the Rule of Three would give top scorers an opportunity for promotion, depending on the number of vacancies, but no guarantee of

---

[11]While plaintiffs, who describe their considerable efforts to perform well on this infrequently given promotion exam, are understandably disappointed and frustrated that their successful study efforts have come to naught this time, this result is not evidence of being disadvantaged because of their race nor evidence of disparate impact because it does not show injury or disadvantage, only uncertainty as to their performance in the City's next promotion selection process.

promotion; it is even conceivable that the applicant with the highest score never would be promoted. See United States v. City of Chicago, 869 F.2d 1033, 1038 (7th Cir. 1989) (where state law permitted promotion from among five highest-ranked individuals on eligibility list, challenger had no property right to promotion: "a roster ranking may create an expectation of promotion, but an officer has no entitlement to a particular roster position or to promotion."); Bridgeport Firebird Society v. City of Bridgeport, 686 F. Supp. 53, 58 ("At best, the provisions of the City Charter [mandating a Rule of One for promotions] provide the firefighters ranked on the . . . eligibility list only with a mere expectation of promotion, which does not rise to the level of a legally protected interest, especially in the face of 'presumptively discriminatory employment practices.'") (quoting Kirkland, 711 F. 2d at 1126)).

Thus, while the facts of Hayden were slightly different than those here, the Court finds the holding quite relevant and instructive. Defendants' motivation to avoid making promotions based on a test with a racially disparate impact, even in a political context,[12] does not, as a matter of law, constitute

[12]Assuming arguendo that political favoritism or motivations may be shown to have been intertwined with the race concern, that does not suffice to establish a Title VII violation. See, e.g., EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1321 (10th Cir. 1992) (pretext is not shown merely because "some less seemly reason – personal or political favoritism, a grudge, random conduct, an error in the administration of neutral rules – actually accounts

39

discriminatory intent, and therefore such evidence is insufficient for plaintiffs to prevail on their Title VII claim. Accordingly, the Court will grant defendants' motion and deny plaintiffs' motion for summary judgment on this claim.

## B.   Equal Protection Claim

Plaintiffs argue that defendants violated the Equal Protection Clause either by employing a race-based classification system for promotion or, alternatively, by applying facially neutral promotion criteria in a racially discriminatory manner. Defendants counter that they did not employ any racial classifications because every applicant was treated the same when the CSB decided that nobody would be promoted off the lists, and there was no discriminatory intent against whites motivating their non-certification decision. Additionally, defendants argue that plaintiffs lack standing to bring an Equal Protection claim.

### 1.   Standing

Defendants acknowledge, as they must, that non-minorities have been found to be in a protected group for purposes of standing under the Equal Protection Clause. See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210 (1995) (holding that non-minority-owned business' "allegation that it has lost a contract in the past because of a [minority set-aside] subcontractor compensation clause of course entitles it to seek

for the decision").

40

damages for the loss of that contract."). However, defendants argue that because plaintiffs have not suffered any harm, and specifically because plaintiffs were not "passed over for a benefit that was given to an allegedly less deserving minority," Def. Reply Mem. at 37, they lack standing.

Defendants confuse standing with the merits of the case. The constitutional injury plaintiffs claim here is not failure to be promoted, but failure to be treated equally on the basis of race. Plaintiffs have standing to bring such a claim. See Comer v. Cisneros, 37 F.3d 775, 791 (2d Cir. 1994) (plaintiff had standing to bring equal protection claim where she alleged that the defendant's Section 8 housing subsidy program "rules and regulations, in their administration, violate the Constitution because they erect a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it was for non-minorities").

## 2. Racial Classification/Discriminatory Intent

Plaintiffs' Equal Protection claim, however, lacks merit, with respect to both the racial classification and disparate treatment arguments. As the Second Circuit held in Hayden when rejecting plaintiffs' classification argument, if an exam is "administered and scored in an identical fashion for all applicants," there is no racial classification. Hayden, 180 F.3d at 48. Further, a "desire" "to design an entrance exam which

41

would diminish the adverse impact on black applicants ... does not constitute a 'racial classification.'" Id. Here, all applicants took the same test, and the result was the same for all because the test results were discarded and nobody was promoted. This does not amount to a facial classification based on race.[13] Likewise, where a test is administered and scored in the same manner for all applicants, plaintiffs cannot make out a claim that the exam was a facially neutral test used in a discriminatory manner. Id. at 50.

Plaintiffs argue that their equal protection rights were violated because they passed the tests and therefore were not similarly-situated to minority applicants who failed. Plaintiffs argue that if a black employee "shows up for work and works a full day" and a white employee does not, and the black employee

---

[13]Therefore, plaintiffs' reliance on Berkley v. United States, 287 F.3d 1076 (Fed. Cir. 2002), is unavailing. In that case, the Air Force employed facially different criteria for selecting women and minority employees for layoff compared to white male employees, and the Federal Circuit held that such a program should be subjected to strict scrutiny (without ruling on the merits). Likewise, in Dallas Fire Fighters Assoc. v City of Dallas, 150 F.3d 438 (5th Cir. 1998), also relied on by plaintiffs, the city followed an affirmative action plan that specifically called for promoting African-American, Hispanic and female firefighters out of rank, ahead of white and Native American male fighters with higher test scores. Here, no classification system was employed, as the test results were discarded for every examinee regardless of race. While defendants clearly were concerned with achieving diversity in the department by enhancing minority promotional opportunity, plaintiffs offer no evidence that defendants employed an actual race-based affirmative action plan that advantaged minority over white applicants for promotion.

42

complains "that he was due his wages," the employer cannot be heard to defend the complaint on the ground that the employees were treated the same because neither was paid. Pl. Mem. in Opp. at 64. Plaintiffs' analogy is faulty because performing well on the exam does not create an entitlement to promotion, whereas working entitles an employee to be paid. Second, a presumptively flawed test result may not be a proper measure for determining whether anyone should be promoted.

Finally, plaintiffs cannot show that defendants acted out of an intentionally discriminatory purpose. "Discriminatory purpose 'implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" Id. (quoting Personnel Administrator v. Feeney, 442 U.S. 256, 279 (1979)). Nothing in the record in this case suggests that the City defendants or CSB acted "because of" discriminatory animus toward plaintiffs or other non-minority applicants for promotion. Rather, they acted based on the following concerns: that the test had a statistically adverse impact on African-American and Hispanic examinees; that promoting off of this list would undermine their goal of diversity in the Fire Department and would fail to develop managerial role models for aspiring firefighters; that it would subject the City to public criticism; and that it would likely subject the City to Title VII lawsuits

43

from minority applicants that, for political reasons, the City did not want to defend. "[T]he intent to remedy the disparate impact of [the tests] is not equivalent to an intent to discriminate against non-minority applicants." Hayden, 180 F.3d at 51. None of the defendants' expressed motives could suggest to a reasonable juror that defendants acted "because of" animus against non-minority firefighters who took the Lieutenant and Captain exams.

Accordingly, defendants' motion for summary judgment on this claim will be granted and plaintiffs' motion will be denied.[14]

### C.    Civil Rights Conspiracy

Title 42 U.S.C. § 1985(3) permits recovery of damages if a plaintiff can prove a conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." Because the Court has found that plaintiffs fail to present sufficient evidence that their equal protection rights were violated, their § 1985 conspiracy claim must fail as well. See Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1088 (2d Cir. 1993) (evidence of "racial or perhaps otherwise class-based, invidious discriminatory animus" required to prevail on § 1985 claim).

---

[14]For this reason the Court need not reach defendants' arguments that they are entitled to qualified immunity on the Equal Protection claim.

44

Accordingly, defendants' motion for summary judgment on this claim will be granted.

## D. First Amendment

Defendants additionally move for summary judgment on plaintiffs' First Amendment freedom-of-association claim, which motion will also be granted.

Plaintiffs do not attempt to rebut defendants' contentions that plaintiffs have not identified a free speech activity in which they participated nor claimed that any chilling of speech resulted. Rather, plaintiffs argue that the CSB's non-certification decision, and the City defendants' advocacy of that decision, resulted from political pressure by defendant Kimber, who threatened the CSB with "political ramifications" if they voted to certify the results. Plaintiffs argue that "a jury could rationally infer that city officials worked behind the scenes to sabotage the promotional examinations because they knew that, were the exams certified, the Mayor would incur the wrath of Kimber and other influential leaders of New Haven's African-American community." Pl. Mem. in Opp. at 73.

While a jury could make such an inference, it would not lead to the conclusion that plaintiffs' First Amendment right to freedom of association was violated as a matter of law. The evidence shows that Kimber spoke at the first CSB hearing and strenuously argued against certification, and the City defendants

45

do not dispute that Kimber is a close political ally of the Mayor. However, there is no evidence in the record to suggest that the non-certification decision was made in retaliation for plaintiffs' refusal to "associate with," or their expression of disagreement with, Kimber. As with the Equal Protection claim, the fact that defendants desired to avoid the wrath of one group (in this case African-American firefighters and other political supporters of Kimber and DeStefano) does not logically lead to the conclusion that defendants intended to discriminate or retaliate against plaintiffs because they were not members of that group. More importantly, there is no evidence in the record even to suggest that defendants knew plaintiffs' political affiliations, i.e., whether they supported Kimber and/or DeStefano on any issue other than the certification of these particular exam results. In sum, in plaintiffs' terms, the record shows that defendants acted to head off the potential adverse impact of the promotion tests on African-American and Hispanic firefighters in order to curry favor with minority voters and political leaders in the City, but it does not contain any evidence of an intent or purpose to target plaintiffs for not supporting that political coalition or its interests. Thus, defendants' motion for summary judgment on the First Amendment claim must be granted.

46

**E.    Intentional Infliction of Emotional Distress**

Having granted defendants summary judgment on all of plaintiffs' federal claims, the Court declines pursuant to 28 U.S.C. § 1367(c) to exercise supplemental jurisdiction over plaintiffs' state law claim for intentional infliction of emotional distress.  See Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 103 (2d Cir. 1998) ("28 U.S.C. § 1367(c)(3) . . . permits a district court, in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims.  The Supreme Court, in Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988), announced that when all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.").

**IV.    Conclusion**

Accordingly, defendants' motion for summary judgment [Doc. # 52] is GRANTED as to the claims under Title VII, the Equal Protection Clause, 42 U.S.C. § 1985, and the First Amendment. Plaintiffs' cross-motion for summary judgment [Doc. # 60] is DENIED.  The Court declines supplemental jurisdiction over plaintiffs' claim for intentional infliction of emotional

47

distress.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 28th day of September, 2006.**

48